LOUISE WALLWORK v. CITY OF NASHVILLE et al.[*]

(*Nashville.* December Term, 1922.)

1. **CHARITIES.** Charitable municipal hospital not liable for negligence of employees, even where fees paid by patient.

A charitable municipal hospital is exempt from liability, due to the negligence of its employees, even where fees were paid by the patient injured by such negligence. (*Post, pp.* 690-697.)

Cases cited and approved: Abston v. Waldon Academy, 118 Tenn., 24; Gamble v. Vanderbilt University, 138 Tenn., 616; Weston v. Hospital of St. Vincent, 131 Va., 587; Taylor v. Flower Deaconess Home & Hospital, 104 Ohio St., 61; Schloendorff v. Society of New York Hospital, 211 N. Y., 125; Morgan v. Shelbyville, 121 S. W., 617; Jones v. City of Corbin, 98 S. W., 100; Maxmilian v. New York, 62 N. Y., 160.

Cases cited and distinguished: Browder v. City of Henderson, 182 Ky., 771; Bell v. City of Cincinnati, 80 Ohio St., 1; Benton v. Boston City Hospital, 140 Mass., 13; Cook, Adm'r, v. John N. Norton Memorial Infirmary, 180 Ky., 331; Caroline Tollefson, Adm'x, v. City of Ottawa, 228 Ill., 134; Watson v. City of Atlanta, 136 Ga., 370; Love v. City of Atlanta, 95 Ga., 129.

2. **CHARITIES.** City and hospital commissioners held not liable for injuries to pay patient in charitable hospital due to nurse's negligence.

Where plaintiff, a pay patient in a charitable municipal hospital, underwent an operation and was severely burned upon the feet by a hot water bottle placed in her bed by hospital employees before she recovered from the effects of the anæsthetic, it was not error to direct a verdict for the city and hospital commissioners, there being no claim that they did not exercise ordinary care in selecting the employees, the hospital existing for purely governmental purposes under the exclusive ownership and control of the city. (*Post, pp.* 697, 698.)

*On liability of privately conducted charity for personal injuries, see notes in 14 A. L. R., 572, 23 A. L. R., 923.

On liability of charitable institutions for personal injuries, see notes in 23 L. R. A., 200; 7 L. R. A., (N. S.), 481; 10 L. R. A. (N. S.), 74; 22 L. R. A. (N. S.), 486; 32 L. R. A. (N. S.), 62; 42 L. R. A. (N. S.), 144; 52 L. R. A. (N. S.), 505; 6 B. R. C., 552.

3. **CHARITIES.** No recovery for negligence not charged in declaration.

Where a pay patient in a charitable municipal hospital was severely burned upon the feet by a hot water bottle before recovering from the anæsthetic administered during an operation, no recovery could be had as against a nurse on the ground that when her attention was called to the presence of the hot water bottle, and that it was too hot, she replied that it was supposed to be there, and failed to examine it, no such allegation of negligence being charged in the declaration. (*Post, pp.* 698-700.)

FROM DAVIDSON.

Appeal from the Circuit Court of Davidson County.— HON. A. B. NEIL, Judge.

WM. S. NOBLE and J. C. MORELOCK, for appellant.

MORTON B. ADAMS and O. M. GOLDEN, for appellee.

MR. JUSTICE MCKINNEY delivered the opinion of the Court.

Miss Wallwork instituted this suit to recover damages for injuries sustained while a patient at the City Hospital.

The defendants to the suit are the city of Nashville, the hospital commissioners of said city, Miss Wickham and Miss Wright, two nurses in charge of the ward in which plaintiff was a patient at the time of her injury.

The superintendent of the hospital, Dr. Fessey, was also made a party defendant, but plaintiff dismissed her suit as to him before the trial.

At the conclusion of the plaintiff's evidence, a motion for a directed verdict was sustained as to all of the defendants except Miss Wright, and the jury returned a verdict in her favor.

The motion for a directed verdict as to all of the defendants except Miss Wickham was based upon the idea that said hospital was created and existed purely for governmental purposes, which exempted the city and said board of hospital commissioners from liability for injury received by a patient due to the negligence or misconduct of its employees.

As to Miss Wickham, the motion for a directed verdict was sustained upon the ground that there was no evidence connecting her with the injury complained of.

Upon appeal, the court of civil appeals affirmed the judgment of the trial court, and the case is before us upon petition for writ of *certiorari* filed on behalf of the plaintiff.

The facts of the case, as detailed by Dr. Parrish, are as follows:

"I am the family physician of A. H. Wallwork, and plaintiff, Louise Wallwork, was my patient and under my care. Her condition became such that I advised that she be taken to the City Hospital for surgical operation for appendicitis. So on the 9th of October, 1920, I made arrangements with the hospital authorities at the City Hospital for her reception at the hospital and for an operation for appendicitis by Dr. Fessey, the surgeon in charge of the City Hospital, and she was taken to the hospital on that date and received as a patient in the hospital, and was operated on by Dr. Fessey about 11 o'clock a. m. on that date. She was admitted to the hospital as a pay pa-

tient. Her father, A. H. Wallwork, having made the finan-
cial arrangements for her admittance, the plaintiff, Louise
Wallwork, was taken to the operating room, and after the
necessary preparation the operation was successfully per-
formed by Dr. Fessey. I assisted Dr. Fessey in the op-
eration, and when it was over and the patient left the op-
erating room, Dr. Fessey's operating duties were terminat-
ed. After the operation Dr. Fessey turned the patient
back to me, and I had her sent to the ward where she was
to remain. The operation was performed under ether and
the patient was still unconscious when she was removed
from the operating room to the ward. I saw Miss Wall-
work placed in her bed in the ward, at which time I saw
a hot water bottle in the bed, but did not examine it. I
saw her again that night after supper, at which time she
had not entirely recovered from the anæsthetic and was
nauseated. I called again to see her the next morning
when the effects of the ether were gone and she was con-
scious and complaining that her heels were burned. On
examination I found that her feet had been horribly burned,
and she was in great pain and suffering at the time.
I made an examination of her feet and found that the flesh
on the bottom of both heels had been cooked. The burns
included the skin, the flesh, and everything that makes up
the heel. I applied proper remedies from time to time,
and after about one week she was removed to her father's
home, where I continued to treat her for these burns for
a period of over four months. The skin and flesh of the
heels sloughed away, and she was absolutely unable to
walk or stand on her feet for this entire period of four
months, and even after the burns had healed she had to
use pads of cotton in her shoes beneath the heels in order

to walk upon the feet properly. This injury is a permanent injury, and she will never be able to walk naturally as before the burns. There is no cushion or ball to the heels at all. By the sloughing away of the flesh there is left a hollow surface in the heel that will never fill out. Taking the nature of the injury, its location, I am of the opinion that it was caused by the application of heat from a hot water bottle. It is customary and proper practice after a major operation of this nature, which is usually followed by shock, to apply hot water bottles to the body and particularly the feet, to stimulate the patient and assist in reviving them. Within the past year or so there has been added a new wing to the hospital, which is used exclusively for pay patients, and my observation is that about one-fourth of the hospital wards are used for pay patients exclusively, and the remainder of the city hospital is used for charity patients. The hospital fees for pay patients at the City Hospital at the time of the admittance of the plaintiff, Louise Wallwork, were $5 for the operating room and $2 per day, which included all other expenses at the hospital—room, food, nursing, dressings and general care. These fees were about the same as the hospital fees being charged at that time at St. Thomas, the Protestant and Woman's Hospital for similar service. The City Hospital makes no extra charge for medicines and dressings excepting where they are exceptionally expensive. The other hospitals mentioned above do charge extra for medicine to the patients. The other hospitals do not furnish free surgical work to the pay patients. No surgeon's fee was charged, and none was paid to Dr. Fessey, who at that time was the surgeon in charge of the hospital. Neither the surgeon nor the city received any

fee or compensation for the operation on Miss Wallwork. The usual and average surgeon's fee in a case similar to that of Miss Wallwork's is about $150. I do not know who prepared the bed for Miss Wallwork's reception after the operation; Miss Wickham and Miss Wright were the two nurses employed by the hospital authorities and who had exclusive charge of the pay patients in the ward where Louise Wallwork was placed, and necessarily they had charge of Miss Louise. It was the duty of these nurses to prepare the beds for the reception of the patients after operations, and particularly to prepare and place the hot water bottles, properly, after the patient was put to bed, and of course to attend the patient continuously from time to time, and especially while she was in a comatose condition, or under the shock of and under the influence of the anæsthetic."

It also appears from the testimony of A. H. Wallwork, father of the plaintiff, that upon reaching the hospital he paid to the hospital authorities $19, which included $5 for the use of the operating room, and $14 for board, nursing, medicine, etc., for his daughter for one week.

The charter of the city of Nashville imposed upon it the duty of maintaining a hospital and provided for its management. Among the provisions of said charter are the following:

"Sec. 30. Be it further enacted that the board of commissioners of said city shall, within the limitations of this act provided, have powers by ordinance. . . .

"(3) To make all rules and regulations to secure the general health of the inhabitants; to prevent introduction of contagious diseases into the city; to make quarantine laws for such purpose, and enforce the same within ten

miles of the city; to establish hospitals and make regulations for the government thereof; . . .

"Sec. 41. Be it further enacted that in said city there shall be a board to be known as the 'board of hospital commissioners,' said board to consist of five (5) members, who shall at the time of their election have been citizens of the territory embraced within the corporate limits of said city for five (5) years prior to the time of their election. . . . No compensation shall be received by any member of said board of hospital commissioners for any services performed by him as such commissioner; and each member of said board shall serve during good behavior, and until his successor is elected and qualified by the board of commissioners of said city. . . .

"The board of hospital commissioners is hereby authorized and empowered to employ a superintendent and surgeon for each hospital, and all other employees, and to fix their compensation; but 'no person shall be eligible to the office of superintendent and surgeon in charge of any hospital or hospitals unless he shall be a physician of reputable character in his profession, a graduate in medicine of skill and culture, who shall have had at least five (5) years' experience in the practice of his profession prior to the date of his election, two (2) years of which shall have been spent by him in some reputable hospital. . . .

"All nurses, attendants, and other medical employees shall be employed by the superintendent and surgeon in charge, and their compensation fixed by him, but between limits prescribed by the board of hospital commissioners. . . .

"All money collected from private or pay patients at the City Hospital, as well as from clinical fees which may

be charged, the students of the various medical schools of said city as fixed by the rules and regulations of the board of hospital commissioners, and all other revenues derived from operation and conduct of the hospital, shall be paid to the city treasurer of said city, who shall keep the same separate from the other revenues of the city and to the credit of the hospital department, and said money so collected shall be used for the maintenance of said hospital or hospitals in addition to the amount set aside in the yearly budget by the board of commissioners for hospital purposes.

"The board of commissioners of said city is hereby authorized and empowered to include in the annual levy of taxes for said city a special hospital tax of one-third of one mill on each dollar's worth of property assessed for city taxation, and the money thus levied shall constitute a special fund with which to operate the affairs of the hospital as provided by this act; provided, however, that the board of commissioners of said city shall have power to include in the yearly budget money over and above that realized from the special tax herein authorized in the event said tax is levied and collected, and to appropriate such surplus money for the maintenance and conduct of such hospitals. . . ."

It is conceded that a hospital created and existing for purely governmental purposes, and under the exclusive ownership and control of the city, is not liable for injuries to a patient caused by the negligence or misconduct of its employees.

But counsel for plaintiff contends that since this hospital maintained a wing for those who were enabled to pay in part the city thereby became liable for any injuries re-

sulting to a patient in said wing, their insistence being that the fact that the plaintiff paid for a part of the services rendered to her takes the case without the general rule.

This question has not been heretofore passed upon by this court in any reported case. The court, in *Abston* v. *Waldon Academy*, 118 Tenn., 24, 102 S. E., 351, 11 L. R. A. (N. S.), 1179, and *Gamble* v. *Vanderbilt University*, 138 Tenn., 616, 200 S. W., 510, L. R. A., 1918C, 875, held that eleemosynary educational institutions were exempt from liability for injuries due to the negligence of their agents and employees even where fees were charged.

It may be said by the very great weight of authority it is now held, on grounds of public policy, that a private charitable hospital which has exercised ordinary care in the selection of its employees is not liable for injuries resulting from their negligence.

In 11 Corpus Juris, 377, it is said:

"Except in some jurisdictions, it is a rule that those who furnish hospital accommodations and medical attendance, not for the purpose of making profit thereby, but out of charity, or in the course of the administration of a charitable enterprise, are not liable for the negligent or other tortious acts of the physicians, nurses, attendants, or other persons in their employment or service, but only for their want of ordinary care in selecting them. Also, except in some jurisdictions, the same rule applies where plaintiff has paid for the services rendered, where the amount received was not for private gain, but to accomplish more effectually the purposes for which the charity was founded."

147 Tenn.—44.

The decisions upon this question are collected in the cases of *Weston* v. *Hospital of St. Vincent,* 131 Va., 587, 107 S. E., 785, 23 A. L. R., 907, and note; *Taylor* v. *Flower Deaconess Home & Hospital,* 104 Ohio St., 61, 135 N. E., 287, 23 A. L. R., 900; and *Schloendorff* v. *Society of New York Hospital,* 211 N. Y., 125, 105 N. E., 92, 52 L. R. A. (N. S.), 505, Ann. Cas., 1915C, 581, and note. In these cases it is also held that the rule applies to a pay patient as well as to one who does not pay. The principle of law as to private charitable hospitals, set forth above, upon reason, would apply to a municipal charitable hospital, for courts would not extend a greater latitude of exemption to a privately conducted charity than to a public one, for in the former the service rendered might be restricted to certain classes, while in the latter the service is extended to all citizens.

The authorities support the doctrine that a charitable municipal hospital is exempt from liability, due to the negligence of its employees, even where fees were paid by the patient.

In McQuillin on Municipal Corporations, vol. 6, section 2669, the author says:

"The duty of a municipal corporation to conserve the public health is governmental, and it is not liable for injuries inflicted while performing such duty. The decisions are practically unanimous in holding that a municipality is not liable for the torts of its board of health or other health officers on the theory that the duty in regard to preventing sickness or caring for sick people is strictly a governmental or public function.

"Accordingly a municipal corporation is not liable for the negligence of its officers and employees in conducting

a municipal hospital, or in the treatment of patients therein, whether the purpose of the hospital be charitable or to provide for the general health and welfare by preventing and suppressing the spread of disease. In the latter case, the authority to maintain the hospital must be regarded as an exercise of the police power, within the rule that a municipality is not liable for the negligent act of its agents or servants engaged in enforcing, executing, or giving effect to its police ordinances and regulations.

"On the other hand, if a municipality has power to, and does, maintain a hospital for revenue, there is no doubt but that it would be liable for the torts of persons employed about the hospital; but if it conducts the hospital for revenue, but without power to do so, it is not liable. However, the fact that fees are charged some patients in a city hospital, where it does not charge fees of all patients, does not render the municipality liable for negligence in connection therewith."

In *Browder* v. *City of Henderson*, 182 Ky., 771, 207 S. W., 479, the plaintiff brought suit to recover damages due to the negligence of the employees of the city of Henderson, it being charged that while a patient in said hospital the nurse in charge placed a hot water jug to her feet, which resulted in the burning of her feet. The court in the opinion, after announcing the general rule to the effect that the city was exempt, said:

"Counsel for appellant seeks to make a distinction between this case and certain of the cases cited, because the hospital maintained by the city of Henderson receives and cares for both free and pay patients; it being earnestly contended that, because the city receives pay for certain services and attention, the hospital is conducted, to use

the expression of appellee's counsel, 'as purely public charity.' But this court and other courts have held that the mere fact that the city may receive some pay or re- muneration in the operation or maintenance of its public institutions does not take the case out of the general rule. This point was made in the case of *Morgan* v. *Shelbyville,* 121 S. W., 617, it being contended in that case that, inas- much as all fines imposed in the city court for violations of the ordinances of the city were by virtue of the statutes covered into the city treasury, rather than paid over to the State, the city was engaged in maintaining its guard- house as a private enterprise for its especial benefit, and that in erecting and maintaining this guardhouse it was not engaged in the discharge of a public duty as an arm of the State. Quoting from *Jones* v. *City of Corbin,* 98 S. W., 1002, 30 Ky. Law Rep., 374, the court says:

" 'The maintenance of a municipal court and prison is in pursuance of the city's governmental functions, and in so doing it is but an arm of the State in upholding the public peace and safety. The principle is well established that municipal corporations are not liable either for the nonfeasance or malfeasance of their public officers in the discharge of their governmental functions.'

"In *Bell* v. *City of Cincinnati,* 80 Ohio St., 1, 88 N. E., 128, 23 L. R. A. (N. S.), 910, this same point was made, and the court rejected it, stating:

" 'There is no evidence that one penny of profit was re- alized on the disposition it made of stone, if that be a mat- ter of concern. In so far as the facts inform us, or fail to inform us, the receipts for stone sold would only part pay the expenses of keeping and guarding the prisoners while engaged in the quarry, and we will hesitate to be-

lieve that the city was engaged in a commercial enterprise, while it may have been endeavoring, so far as possible, to make the workhouse self-sustaining. All prison labor, including that performed in the state penitentiary, is utilized to pay the cost of maintenance, and in so doing the institution—the State—is not .engaged in a commercial enterprise for profit.'

"*Benton* v. *Boston City Hospital,* 140 Mass., 13, 1 N. E., 836, 54 Am. Rep., 436: Plaintiff had a sick child, which had been in the hospital for some time, and on a visit to see said child, while leaving the hospital, the mother was injured.through a defective stairway, and brought suit for damages. It was shown that the city council appropriated a considerable sum of money for the maintenance of the hospital, and this was supplemented by money received from certain pay patients, all of which went toward the maintenance of the hospital, and it was sought to hold the city liable for the negligence of the superintendent in permitting the steps to become defective and in a dangerous condition, but the court affirmed the judgment of the lower court in sustaining a demurrer to the petition.

"The court has held that charitable or eleemosynary institutions are not liable for the negligence of their employees, and the fact that they receive pay from some of their patients does not alter the rule. *Cook, Adm'r, et al.* v. *John N. Norton Memorial Infirmary,* 180 Ky., 331, 202 S. W., 874. In this case the court says:

" 'An examination of the authorities has convinced us that a purely charitable institution, such as defendant's hospital is described in the pleadings to be, is not amenable to its patients, although paid ones, for any damages which they may have sustained growing out of alleged

negligence, although such negligence might consist in the violation by the hospital of some duty imposed either by an express or an implied contract. The cases dealing with the subject seem to treat the cause of action as one sounding in tort, although the liability, if any, was created by the negligent failure on the part of the hospital to observe some alleged contractual duty, which is analogous to the rule applied to common carriers in suits by their passengers who sustain contractual relations the one with the other, although the suit is generally treated as one sounding in tort.' "

In *Caroline Tollefson, Adm'x,* v. *City of Ottawa,* 228 Ill., 134, 81 N. E., 823, 11 L. R. A. (N. S.), 990, the petition alleged that the defendant city possessed, controlled, and managed the hospital, and that plaintiff's decedent, while sick, was received by the defendant into said hospital as a patient, and sought damages because of the negligent conduct on the part of defendant and its agents in caring for deceased during her sickness, which negligence resulted in the aggravation of her malady and later in her death. In the third count it was alleged that the hospital was maintained by the defendant for revenue and profit. A demurrer to said petition was sustained, and affirmed on appeal.

In *Watson* v. *City of Atlanta,* 136 Ga., 370, 71 S. E., 664, the plaintiff sought to recover damages for personal injuries alleged to have been received in consequence of being run upon and knocked down by a Grady Hospital ambulance in charge of and under the control of agents and employees of the city. In holding the city not liable, the court said:

"We think that under the provisions of this section of the charter the city of Atlanta is authorized to establish and maintain a public hospital. The maintenance of such an institution may well be regarded as in a measure incidental and necessary to the security and preservation of the health and well-being of the citizens, who in the hour of need require the care and attention of such skilled nurses and physicians as may be selected and employed by the officials who are elected or appointed by the municipal authorities to conduct the hospital and render the services requisite and proper for such an institution. In the case of *Love* v. *City of Atlanta,* 95 Ga., 129, 22 S. E., 29, 51 Am. St. Rep., 64, it was said: 'In the discharge of such duties as pertain to the health department of the State, the state is acting strictly in the discharge of one of the functions of the government. If the State delegate to a municipal corporation, either by general law or by particular statute, this power, and impose upon it within its limits the duty of taking such steps and such measures as may be necessary to the preservation of the public health, the municipal corporation likewise, in the discharge of such duty, is in the exercise of a purely governmental function, affecting the welfare, not only of the citizens resident within its corporation, but of the citizens of the commonwealth generally, all of whom have an interest in the prevention of infectious or contagious diseases at any point within the State, and in the exercise of such powers is entitled to the same immunity against suit as the State itself enjoys. Such a duty will stand upon the same footing as its duty to preserve the public peace, and its liability or nonliability would depend upon the same principle which relieves the city from liability for the mis-

feasance of a police officer in the discharge of his duty.
.   .   .   It can make no difference in principle as to the
character of the agents employed in the discharge of this
duty with respect to the public health.   The principle of
nonliability rests upon the broad ground that in the dis-
charge of its purely governmental functions a corporate
body, to which has been delegated a portion of the sover-
eign power, is not liable for torts committed in the dis-
charge of such duties and in the execution of such powers.
It can be no more liable because of the failure to select
competent drivers of garbage carts than a city could be
held liable for failing to elect a wise, conservative, and
discreet mayor.'   We are of the opinion that under the de-
cision in the case just referred to, and the reasoning upon
which the conclusion reached in that case is based, the
operation of the ambulance is an incident to the mainte-
nance and operation of the hospital itself and is conse-
quently to be classed with those acts in the performance of
which the municipal corporation is exercising a govern-
mental function.

"It is true that it is alleged in this petition that 'in the
maintenance of said Grady Hospital the city of Atlanta
charged fees for patients entering therein;' but we cannot
construe this allegation to be an affirmative allegation that
the city requires of all its patients payment for expense
of board and treatment at the Grady Hospital, as would
be the case of a private hospital maintained and operated
for profit and the pecuniary advantage of those who own
and operate it.   Had the distinct allegation been that the
hospital was established and operated for private gain
and profit by the city, quite another case would have been
made from that presented in this petition.   If the pleader

had wished to charge that the city of Atlanta maintained and operated the Grady Hospital for private gain and profit, and that to this end it charged fees of all of its patients, it would have been very easy to have made that distinct averment. For the Grady Hospital to charge fees from some of its patients is not at all inconsistent with its character as a public institution and one operated by the municipal corporation in the performance of its governmental duties. Under the authority of the case of *Love* v. *City of Atlanta,* supra, the court below ruled rightly in sustaining the demurrer and dismissing the case. See, in this connection, 2 Dillon on Municipal Corporations, section 977, and cases cited, especially that of *Maxmilian* v. *New York,* 62 N. Y., 160, 20 Am. R., 468, and Elliott on Mun. Corp. 327."

Learned counsel for the plaintiff have cited no authorities taking a contrary view to that expressed in the foregoing cases, and, upon both reason and authority, we are of the opinion that the court committed no error in sustaining a directed verdict in favor of the city and the hospital commissioners. There was no allegation or claim that the city or the commissioners did not exercise ordinary care in the selection of its employees.

No error is assigned upon the action of the court in directing a verdict as to Miss Wickham. The only remaining question is was there any evidence to support the verdict of the jury in exonerating Miss Wright from liability? There is no direct evidence that Miss Wright placed the hot water bottle on the bed.

Henry Wallwork, a cousin of the plaintiff, testified that he went to the hospital in the automobile with plaintiff and her father and mother. This witness further testified:

"Q. Did you examine the hot water bottle? A. Yes, sir.

"Q. Was it hot? A. Yes, sir.

"Q. How hot was it? A. It was so hot you couldn't hold your hand on it.

"Q. Did you call the attention of any one out there in the hospital to that fact? A. I told that colored fellow that was in there, and he said he didn't have nothing to do with it, and he said he would tell the nurse, and she came in there, and she said it was supposed to be in there. I told her it wasn't supposed to be that hot. She said that wouldn't hurt her like she was, asleep.

"Q. Which one of these nurses was it you were talking to? A. Miss Wright.

"Q. You know Miss Wright, do you? A. Yes, sir.

"Q. And when she came in there and you called her attention to the fact that this hot water bottle was too hot, that it ought not to be in the bed when it was that hot, did she examine it? A. No, sir.

"Q. Just said it ought to be there, and it wouldn't hurt this patient while she was asleep? A. Yes, sir.

"By the Court:

"Q. Which one was it? A. Miss Wright."

The substance of his testimony is that he called Miss Wright's attention to the fact that the water bottle was too hot, to which she replied (without examining it), "it was supposed to be in there."

This alleged act of negligence on the part of Miss Wright cannot be the basis of a recovery for the reason that no such allegation of negligence was charged in the declaration.

This witness further testified that he did not know who placed the bottle on the bed.

Neither Dr. Parrish, nor any of the other members of the plaintiff's family testified as to the presence of this witness.

A. H. Wallwork, father of the plaintiff, testified:

"Dr. Parrish, my wife, Louise, and I went to the hospital in a car together, and I don't think any other friend or member of the family came to the hospital the morning Louise was operated on."

The plaintiff, in her testimony, said: "I was carried to the hospital, City Hospital, for an operation by Dr. Fessey. My father and mother and Dr. Parrish carried me to the hospital."

Mrs. Wallwork, the mother of plaintiff, testified: "My husband was only friend or member of family who joined me at hospital before my daughter was carried to operating room."

The foregoing evidence tends to negative the idea that Henry Wallwork accompanied plaintiff and her family to the hospital as testified to by him. He was the last witness introduced for the plaintiff.

In view of the fact that the jury, the trial court and the court of civil appeals rejected this evidence, we cannot say that they did so arbitrarily, as insisted by counsel for the plaintiff, when the foregoing testimony and circumstances detailed above are taken into consideration. Excluding this evidence there is nothing upon which this wrong can be charged to Miss Wright.

Dr. Parrish testified that it was the duty of Miss Wright and Miss Wickham to place the hot water bottle properly, and, such being their duty, it may be presumed that one or the other so placed it. But we do not construe Dr. Parrish's testimony to mean that it was a joint duty, but

simply that it was the duty of one of the nurses in charge of this ward to prepare and place the bottle. The plaintiff did not show on which the placing of this particular bottle devolved. Hence we cannot say that Miss Wright was responsible for the injury.

Mrs. Wallwork's testimony to the effect that she heard Miss Wickham say that she did not place the bottle on the bed is not substantive evidence to the effect that Miss Wickham did not so place it, nor is it evidence imputing to Miss Wright the responsibility for the wrong.

Upon the whole, we find no error in the judgment of the court of civil appeals, and it will be affirmed with costs.