MRS. BETTY McMAHON, Plaintiff in Error, v. BARONESS ERLANGER HOSPITAL et al., Defendants in Error.

JAMES ALBERT McMAHON, Plaintiff in Error, v. BARONESS ERLANGER HOSPITAL et al., Defendants in Error.

MR. and MRS. JAMES A. McMAHON, Plaintiffs in Error, v. BARONESS ERLANGER HOSPITAL et al., Defendants in Error.—306 S. W. (2d) 41.

Eastern Section. March 26, 1957.

Petition for Certiorari Denied by Supreme Court, August 19, 1957.

Campbell & Campbell, Chattanooga, for plaintiff in error.

Spears, Moore, Rebman & Williams, Chattanooga, for defendant in error.

HALE, J. These three suits were based upon the malpractice or negligence of a nurse selected by and in the employ of Baroness Erlanger Hospital, which is owned and operated by Hamilton County and the City of Chattanooga by and through a Board of Trustees.

At the conclusion of plaintiffs' evidence the learned trial judge sustained defendants' motion for peremptory instructions on the ground of governmental immunity.

Plaintiffs have duly prosecuted this appeal and have assigned numerous errors, which we think can be condensed into the two propositions hereinafter stated.

On February 19, 1953, Mrs. Betty McMahon entered this hospital as a pay patient in an obstetrical case. A junior student nurse at the instruction of the registered nurse on the obstetrical floor gave Mrs. McMahon an injection of a drug called ergotrate. The instructions were to give this after delivery. Mrs. McMahon had been in the delivery room, but as her time was not come she was returned to her room. Both the registered nurse and student nurse assumed she had been delivered, and without observing her condition, which should have been apparent, administered this drug. This caused the uterus to contract and thus brought on pain and suffering and caused the infant to die of anoxemia. She sued for personal injuries, her husband sued for loss of services and medical expenses, and jointly they sued for the death of their child.

In sustaining the motion for peremptory instructions, Judge Hunter said:

"The first issue presented is based upon the defendant's plea of governmental function. That plea is founded on the immunity of the state government from suit, which immunity extends to branches of the state government such as counties and municipalities chartered by the state.

"The law has been well settled in Tennessee for more than 100 years holding such arms of our state government immune so long as the functions of these branches were governmental in nature, such

as the operation of the fire department, police department, garbage vehicles, the operation of schools and so forth.

"This immunity does not exist where a municipality engages in commercial enterprise for the purpose of making a profit such as the operation of our Electric Power Board, nor does it exist where the branch is maintaining a nuisance.

"However, the proof in this case shows beyond doubt that Erlanger Hospital, with all of its buildings, equipment and supplies, is jointly owned by the City of Chattanooga and Hamilton County, Tennessee, and that its trustees all serve by appointment without pay or remuneration of any kind.

"The proof further shows that the hospital is operated by an appropriation of tax money from both the City of Chattanooga and Hamilton County, and other sources of revenue, including approximately eighty-six and one-half per cent of all revenue from paying patients. Other revenue is obtained from miscellaneous gifts, blood bank sales to patients, and other additional appropriations from the city and county to cover operating deficits incurred annually.

"There are several other miscellaneous sources which will be explained later.

"Even though the proof indicates that the greater portion of Erlanger's income is derived by pay patients, it is also shown that several thousand charity patients are treated and hospitalized annually, and a further number are charged a reduced

amount based upon their ability to pay. The rule has been previously stated with reference to governmental function, but to go further, the law in Tennessee for many years has held this:

"The duty of a municipal corporation, and this would include a county government, to conserve public health, is governmental, and is not liable to the courts for its employees while performing such duties, on the theory that the duty in regard to preventing sickness or caring for sick people is strictly a governmental function. Accordingly a municipal corporation or county government is not liable for the negligence of its officers or employees in conducting a hospital or in the treatment of patients therein, whether the purpose of the hospital be charitable or to provide for the general health and welfare by preventing and suppressing the spread of disease and so forth, but this is the law in Tennessee which this Court is bound by and so holds.

"Counsel for the plaintiffs seeks to distinguish between this well established rule of law and the case at bar on the theory that the plaintiff, Mrs. McMahon, was a paying patient, and further that approximately eighty-six and one-half per cent of all revenue derived by the hospital were from this source, and therefore, the hospital is not charitable, but is a commercial enterprise existing for profit. However, the Tennessee Courts hold, as this Court holds now, that the mere fact that the city and county may receive some pay or remuneration, even a larger part in this case, in the operation or maintenance of their hospitals, does not take the case out of the general rule.

"This rule is well established in Tennessee and all other states, as far as ascertainable by this Court.

"The plaintiff seeks to make another distinction on the theory that the hospital operates a tea room or restaurant on the premises and also dispenses soft drinks from automatic dispensers. To hold that the operation by the hospital of a tea room within the confines of the hospital for the comfort and convenience of visiting friends or relatives of patients, expectant mothers, doctors, nurses and other administrative employees, does not come within the rule granting immunity to governmental function would subject the hospital to numerous suits and constant executions against daily or weekly or monthly income from the operation of such facilities. This would necessarily force the closing of hospital run restaurants, magazine stands, soft drink dispensers and all incidental and miscellaneous services which are maintained or operated for the convenience and necessity of the persons named, thereby forcing all such persons to leave the premises for food and reading material at all hours of the day and night and in all conditions of weather; or in the alternative to furnish by the city and county all such facilities free to all comers.

"This indeed would be a burden unbearable by a hospital or public institution. It is the opinion of the Court that the operation of such facilities is a necessary incidental to the operation of a large hospital, and being a necessary incidental, it is likewise a governmental function, and to hold otherwise would be against public policy and interest.

"It is the opinion of the Court that the additional revenue from nurses' tuition, laundry of employees and so forth is received as a necessary incidental to the operation of a large hospital and is also a governmental function. Liability insurance coverage on the part of the defendants would certainly circumvent the governmental immunity rule to the amount of the policy, but the proof in this case clearly shows to the Court that no such policy was in effect at the time of the occurrence of the incident sued upon.

"Therefore, ladies and gentlemen, and for the reasons given, motions of all defendants for directed verdicts were sustained, and these suits were dismissed. This, not being a policy making court nor legislative board, the question of whether the governmental immunity rule is just or unjust or antiquated is obviously not a question for this Court to decide."

As we see it, the record presents two major questions: (1) Was the operation of this hospital a governmental function carrying with it an immunity from liability of the torts of its agents and servants? (2) Did the policy of insurance, Ex. 13, to C. L. Alexander, entitled "Comprehensive Liability Policy, Combination Automobile and General Liability Form," which was in effect at the time of this wrongful act, cover or insure against acts of negligence of the sort alleged and thereby constitute a waiver of governmental immunity?

In 1922 there was the case of Wallwork v. City of Nashville, 147 Tenn. 681, 251 S. W. 775, 777 (McKinney, J.), in which it was held that the conduct of such a hos-

pital is in the exercise of a governmental function, with attaching immunity from liability, citing the following extract from McQullin on Municipal Corporations, Vol. 6, Sec. 2669, viz.:

"The duty of a municipal corporation to conserve the public health is governmental, and it is not liable for injuries inflicted while performing such duty. The decisions are practically unanimous in holding that a municipality is not liable for the torts of its board of health or other health officers on the theory that the duty in regard to preventing sickness or caring for sick people is strictly a governmental or public function.

"Accordingly a municipal corporation is not liable for the negligence of its officers and employees in conducting a municipal hospital, or in the treatment of patients therein, whether the purpose of the hospital be charitable or to provide for the general health and welfare by preventing and suppressing the spread of disease. In the latter case, the authority to maintain the hospital must be regarded as an exercise of the police power, within the rule that a municipality is not liable for the negligent act of its agents or servants engaged in enforcing, executing, or giving effect to its police ordinances and regulations.

"On the other hand, if a municipality has power to, and does, maintain a hospital for revenue, there is no doubt but that it would be liable for the torts of persons employed about the hospital; but if it conducts the hospital for revenue, but without power to do so, it is not liable. However, the fact that fees

are charged some patients in a city hospital, where it does not charge fees of all patients, does not render the municipality liable for negligence in connection therewith.''

In the more recent case of Lane v. City of Knoxville, 170 Tenn. 482, 96 S. W. (2d) 769 (Chambliss, J.), the Wallwork case was cited and approved and it was held that the city was not liable for a wrongful autopsy performed by its agents or servants.

■ There is some criticism of this rule of government immunity. See Prosser on Torts, (2d) Ed., sec. 109, at pages 774 et seq., but it would be fruitless to go into this or cases outside of Tennessee for the very simple reason that the Wallwork and Lane cases, supra, settle this issue in this state. And in spite of a growing trend otherwise, these holdings are in accord with the great weight of authority, even though they may work an injustice in individual cases.

■ The fact that the City of Chattanooga was empowered by its charter to sue and be sued as an individual was not a waiver of governmental immunity as to torts committed in the pursuance of governmental acts. This phraseology is common to most charters of municipal as well as private corporations.

It is clear that this hospital was not operated for profit but at a loss to the City of Chattanooga and Hamilton County, which were required to absorb an annual operating deficit. It is true that about 87% of its operating cost was derived from private pay patients and the operation of Coca-Cola vending machines, the tea room,

etc., but that does not deprive it of its character or take away its immunity.

As we see it, this case fits squarely within the framework of the Wallwork case and that unless it is overruled by the Supreme Court or unless the legislative branch of the government does away with this doctrine of governmental immunity, counties and cities are not and will not be liable for the torts of their servants in the operation of nonprofit hospitals.

■ That brings us to the second major question, namely, the coverage of the insurance policy in question. Preliminary to this it may be stated that it is well established in Tennessee that governmental immunity may be waived by the procurement of insurance. See City of Kingsport v. Lane, 35 Tenn. App. 183, 243 S. W. (2d) 289 and McCloud v. City of La Follette, 38 Tenn. App. 553, 276 S. W. (2d) 763, and cases cited. So we will proceed on the assumption that if there was insurance coverage against malpractice, this operated as a waiver of immunity.

■ The policy of insurance in question, written by the Royal Indemnity Company, was for the period January 1, 1952, to January 1, 1955. After covering certain owned and non-owned automobiles, it goes to "Description of General Liability Hazards" and mentions the premises, including the hospital próper, and its adjuncts, the Children's Hospital and the Carver Memorial Hospital, all operated by the city and county, giving the area of each and the number of elevators, showing various rates for each. Then in "Coverage A—Bodily Injury Liability", is this insuring agreement:

"To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury, sickness or disease, including death at any time resulting therefrom, sustained by any person and caused by accident."

This was the provision in effect at the time of the injury to Mrs. McMahon, although by rider dated September 1, 1953 (after her injury), it was provided that coverage "A" supra should read:

"The words 'and caused by accident' are deleted and elsewhere the word 'accident' is amended to read 'occurrence'.

"Occurrence means an event, or continuous or repeated exposure to conditions, which unexpectedly cause injury or damage during the policy period, all such exposure to substantially the same general conditions existing at or emanating from each premise location shall be deemed occurrence."

When this original policy was issued, the premium was figured on the number of automobiles involved, the number of square feet in the buildings, and the number of elevators involved. In short, it covered nothing but the motor vehicles, the premises and elevators; there was no coverage of, or premium charge for, malpractice.

There was no specific exclusion clause as to malpractice, but when the policy was renewed on January 1, 1955, such latter clause was included, due possibly to these suits.

From this it is argued that malpractice was included in the policy effective in February, 1953; otherwise there would have been no need for the exclusion clause in the renewal policy. But this does not follow, and should not be used as a vehicle to impose liability for a coverage that was neither bought nor paid for.

■ As a part of this contention it is urged that the trial judge erred in not allowing an insurance agent for another company to testify as to his construction of a ''comprehensive'' policy. In this there was no error; the policy was before the court and it was his duty to construe it from the four corners thereof. We agree with him in the construction put upon it.

Able and zealous counsel for the plaintiffs in error has broken the assignments of error into some twenty grounds, but we think what we have said disposes of all of them.

Having found there was no insurance covering malpractice, it follows there was no waiver of governmental immunity.

The judgment below is affirmed at the cost of the plaintiffs in error.

Affirmed.

McAmis, P. J., and Howard, J., concur