488

[No. 23601. Department Two. February 1, 1932.]

THURSTON COUNTY CHAPTER, AMERICAN NATIONAL RED
CROSS, *Respondent,* v. DEPARTMENT OF LABOR AND
INDUSTRIES, *Appellant,* THURSTON COUNTY,
*Intervener-Respondent.*[1]

*The Attorney General* and *Harry Ellsworth Foster, Assistant,* for appellant.

*James P. Neal, Thos. L. O'Leary, Yantis & Brodie, Frank P. Christensen,* and *Cleland & Clifford,* for respondent.

*Harold P. Troy* and *Smith Troy,* for intervener-respondent.

MAIN, J.—This action was brought by the Thurston county chapter of the American National Red Cross,

[1]Reported in 7 P. (2d) 577.

seeking an injunction to prevent the department of labor and industries of this state from collecting industrial insurance and medical aid premiums on work which the plaintiff had undertaken in this county to relieve the present unemployment emergency. After the action was instituted, Thurston county intervened. The department demurred to each of the complaints, and both demurrers were overruled. The defendant, the department of labor and industries, refused to plead further, elected to stand upon its demurrers, and, from the judgment entered restraining it from collecting industrial insurance or medical aid premiums from either the Red Cross or Thurston county, appeals.

The facts stated in the complaint of the Red Cross may be summarized as follows: It had solicited and collected from the citizens of Thurston county a sum of money for the purpose of relieving the unemployment situation and ministering to the needs of those who were destitute and in need of aid. Pursuant to this plan, it had listed bona fide residents of the county who were without employment and who had no means to support themselves and families. It was arranged with Thurston county, the city of Olympia, and the towns of Tumwater, Tenino and Bucoda, to employ such men as were sent by the Red Cross in repairing, reconstructing and maintaining roads and streets, in clearing right of way along such roads, and in the maintenance of city parks. The work was done under the supervision of the county, city or towns, as the case might be. The county, city and towns paid nothing for the labor and the Red Cross furnished each man performing a day's labor groceries, clothing or medical services to the value of $2.50.

The question is whether, under the facts stated, the Red Cross, a purely charitable organization and not operated for profit or pecuniary gain, is within the

workmen's compensation act and should be required to pay industrial insurance and medical aid premiums.

Section 7673, Rem. Comp. Stat., which is the first section of the workmen's compensation act, states, in part, that the common-law system governing the remedy of workmen against employers for injuries received in hazardous work is inconsistent with modern industrial conditions; that the remedy of the workman has been uncertain, slow and inadequate; that the welfare of the state depends upon its "industries," and even more upon the welfare of its wage worker; that the state, exercising its police and sovereign power, declares that all phases of the premises are withdrawn from private controversy, and sure and certain relief for workmen injured in extrahazardous work, and their families and dependents, is "hereby" provided for, regardless of the question of fault and to the exclusion of every other remedy. Section 1 of chapter 104 of the Laws of 1931, p. 297, which amends Rem. 1927 Sup., § 7676, provides that,

"Inasmuch as industry should bear the greater portion of the burden of the cost of its accidents, each employer shall prior to the fifteenth day of February, 1932, and prior to the fifteenth day of each month thereafter, pay into the state treasury (1) for the accident fund, a sum equal to a percentage of his total payroll for the preceding calendar month, and (2) for the medical aid fund a certain number of cents for each day worked by workmen, all while engaged in extra-hazardous employment."

In Rem. 1927 Sup., § 7675, after defining factories, workshop, mill, mine, quarry, and engineering work, it is provided that:

"Except when otherwise expressly stated, employer means any person, body of persons, corporate or otherwise, and the legal personal representatives of a deceased employer, all while engaged in this state in any

extrahazardous work or who contracts with another to engage in extrahazardous work.

"Workman means every person in this state, who is engaged in the employment of any employer coming under this act whether by way of manual labor or otherwise, in the course of his employment: . . ."

Section 7712, Rem. 1927 Sup., provides, in part, that:

"It is the intent to require the industries of the state to furnish medical, surgical and hospital care to their injured workmen and to place the expense thereof upon each industry as near as may be in the proportion in which it produces injury and creates expense."

The workmen's compensation act repeatedly mentions "industries" which in the ordinary sense are conducted or operated for profit or pecuniary gain, but all extrahazardous industries are not within the act. It has been held that the operation of a passenger or freight elevator is not an extrahazardous employment entitling the operator to compensation for injuries within the definition of the workmen's compensation act; that an accidental injury while engaged in the work of the operation of a hay baling machine on the farm, does not come within the purview of the act; and that a truck driver employed by a wholesale merchant in making deliveries to customers is not engaged in extrahazardous employment within the provisions of the act. *Guerrieri v. Industrial Insurance Comm.*, 84 Wash. 266, 146 Pac. 608; *Barney v. Anderson*, 116 Wash. 352, 199 Pac. 452; *Edwards v. Dept. of Labor and Industries*, 146 Wash. 266, 262 Pac. 973.

A benevolent or charitable organization, such as the Red Cross, which is not operated for profit or pecuniary gain, is not liable for the torts committed by its agents or servants against a patron of the institution, in the absence of a showing that it failed to exercise

reasonable care in the selection of such agent or servant. *Wharton v. Warner,* 75 Wash. 470, 135 Pac. 235; *Magnuson v. Swedish Hospital,* 99 Wash. 399, 169 Pac. 828; *Susmann v. Young Men's Christian Ass'n,* 101 Wash. 487, 172 Pac. 554. The courts of last resort of Massachusetts and New York have held that a charitable or benevolent organization, which is not operated for profit or pecuniary gain, is not within the provisions of the workmen's compensation act of those respective states. *Zoulalian v. New England Sanatorium & Benevolent Ass'n,* 230 Mass. 102, 119 N. E. 686; *Dillon v. Trustees of St. Patrick's Cathedral,* 234 N. Y. 225, 137 N. E. 311.

Though the language of the workmen's compensation act in each of those states is different from that of this state, the cases cited are authority for the position that, before a charitable or benevolent organization, not operated for profit or pecuniary gain, will be required to pay industrial insurance or medical aid premiums, it must come within the language of the act or within the plain import of the language used.

The workmen's compensation act of this state makes no mention of benevolent or charitable organizations, and the whole theory of the act is to the effect that it applies to a trade or business which is operated for profit or pecuniary gain. In the act, the word "industries" is repeatedly used, and this would indicate that the act was intended to apply to a trade or business. It is true that counties and other municipal corporations are within the act when engaged in extrahazardous work and "workmen are employed for wages;" but this is by reason of a special provision. Rem. 1927 Sup., § 7692.

Had the legislature intended to bring within its provisions charitable organizations which were not liable

for torts of its agents and servants except for failure to exercise reasonable care in their selection, it undoubtedly would have said so in plain terms; or from the language used it would be necessarily implied. We are of the opinion that it was not the legislative intent that charitable organizations, such as the Red Cross, engaged in work as above stated, should be within the operation of the act.

The next question is, whether Thurston county should be required to pay industrial insurance and medical aid premiums on account of the work that it permits men, employed and paid by the Red Cross in groceries, clothing or medical services, to do upon its highways and under its direction and supervision. The fair inference from the complaint in intervention is that the Red Cross had the right to discharge the men, or at least refuse to supply them with groceries, clothing or medical services. The county only permitted the men to work under its supervision and direction. In 39 Corpus Juris, page 35, it is said:

"The relation of master and servant exists whenever the employer retains the right to direct the manner in which the business shall be done, as well as the result to be accomplished, or, in other words, not only what shall be done, but how it shall be done. Inasmuch as the right to control involves the power to discharge, the existence of the power to discharge is essential, and is an indicium of the relationship. A mere authority to direct the course of a third person's servant is not inconsistent with his remaining the servant of such third person, . . ."

In 18 R. C. L., p. 490, it is said:

"The relation, whatever term may be used to describe it, exists, it ordinarily is said, whenever one person stands in such a relation to another that he may control the work of the latter and direct the manner in which it shall be done. The essential elements are that the master shall have control and direction not only of

the employment to which the contract relates, but of all of its details, and shall have the right to employ at will and for proper cause discharge those who serve him. If these elements are wanting, the relation does not exist."

By § 1 of chapter 104 of the Laws of 1931, p. 297, above quoted, it appears that the industrial insurance premium is based upon a percentage of the employer's "total payroll for the preceding calendar month." In the present case, the county had no payroll. Since the county had no payroll, and the men were employed and subject to discharge by the Red Cross, and the county only directed and supervised the work done, it would seem to conclusively follow that the county was not an employer within the purview of the workmen's compensation act. The case of *Rector v. Cherry Valley Timber Co.*, 115 Wash. 31, 196 Pac. 653, 13 A. L. R. 1247, is not controlling here because the facts in that case were in no sense analogous, but were entirely different.

The judgment will be affirmed.

TOLMAN, C. J., HOLCOMB, and BEALS, JJ., concur.

MILLARD, J. (dissenting)—I dissent. In my opinion, the work in question is extrahazardous and the relationship of master and servant exists between Thurston county and the workmen.

"The welfare of the state depends upon its industries, and *even more upon the welfare of its wage worker*." Rem. Comp. Stat., § 7673. (Italics mine.)

The purpose of the workmen's compensation act, the legislature emphasized in the foregoing declaration, was not alone to protect the employer, but was to assure relief for the workmen and their families when the breadwinner was injured or killed in extrahazardous employment. Plainly, the statute so provides:

"The State of Washington, therefore, . . . declares that all phases of the premises are withdrawn from private controversy, and sure and certain relief for workmen, injured in extrahazardous work, and their families and dependents is hereby provided regardless of questions of fault and to the exclusion of every other remedy, . . ." § 7673, *supra.*

The act applies to engineering work, which is defined as

". . . any work of construction, improvement or alteration or repair of buildings, structures, streets, highways. . . ." Rem. 1927 Sup., § 7675.

A workman

". . . means every person in this state, who is engaged in the employment of any employer coming under this act whether by way of manual labor or otherwise. . . ." § 7675, *supra.*

An employer is

". . . any person, body of persons, corporate or otherwise . . . while engaged in this state in any extrahazardous work or who contracts with another to engage in extrahazardous work." § 7675, *supra.*

When a county engages in extrahazardous work, such as that described in the case at bar, in which workmen are employed for wages, the county is an employer. Rem. 1927 Sup., § 7692. When the county is the employer, the statute provides that the payments into the accident fund shall be made from the treasury of the county, but if the work is being done by contract, the payroll of the contractor and the subcontractor shall be the basis of computation.

"Whenever the state, county, any municipal corporation or other taxing district shall engage in any extrahazardous work, or let a contract therefor, in which workmen are employed for wages, this act shall be applicable thereto. The employer's payments into the accident fund shall be made from the treasury of the

state, county, municipality or other taxing district. If said work is being done by contract, the payroll of the contractor and the subcontractor shall be the basis of computation, . . .'' Rem. 1927 Sup., § 7692.

The provision, § 1, ch. 104, Laws 1931, p. 297, that the total payroll for the preceding calendar month shall be the basis of industrial insurance premiums, would be applicable if the county had let a contract for the work or if this were a controversy between a contractor and the department. I can not see wherein it is applicable to the facts in the case at bar.

The county directed and supervised the work done by the men sent to it by the Red Cross. The county exercised the right to direct the manner in which the work was performed. The county had the undoubted right of rejecting the services of any or all of the men sent to it to work on the streets, etc. The county had the right to discontinue the work, which would be an effective discharge of the workmen. Clearly, then, the county was an employer.

It is argued that the county had no payroll. The workmen were paid $2.50 (in the form of groceries, clothing or medical services) a day by the Red Cross from funds donated by the citizens of the county for that purpose. The county was receiving services at the rate of $2.50 a day for each man employed. This is the basis of computation for payment of premiums to the industrial fund, which payment, under the circumstances, is payable from the county treasury. The only unusual feature connected with this case is that the county received the benefit of the working men's efforts without cost to the taxpayers. The payments made by the Red Cross were for work done by the workmen as employees of the county, subject to the county's right to hire and discharge these workmen who worked under the supervision of the county.

Whether the payments by the county for the services it accepted and supervised were from funds raised by taxation or from funds donated by the citizens, is immaterial. The county employed the workmen. Those workmen are as much entitled to the benefits of the workmen's compensation act as men working alongside of them receiving more for their labor and who are paid from moneys derived from taxation. To hold otherwise would be inhumane as depriving these unfortunates of the protection of an act passed for their benefit as much as for the benefit of their fellow workers who are paid by the taxpayers.

The county can not, after accepting the services of these men, exempt itself from the burden imposed by the statute. Nor can the employee, by any agreement —however needy he may be—to work for less than the standard wage and accepting that wage in the form of groceries and clothing, waive the benefits of this act which was passed for the protection of all workmen engaged in extrahazardous employment, and their dependents.

"No employer or workman shall exempt himself from the burden or waive the benefits of this act by any contract, agreement, rule or regulation, and any such contract, agreement, rule or regulation shall be pro tanto void." Rem. Comp. Stat., § 7685.