## SESSIONS v. THOMAS D. DEE MEMORIAL HOSPITAL ASS'N.

No. 5907. Decided April 25, 1938. (78 P. 2d 645.)

Rehearing denied, August 8, 1938.

See, also, 89 Utah 222, 51 P. 2d 229.

*Royal J. Douglas,* of Ogden, for appellant.

*DeVine, Howell & Stine,* of Ogden, for respondent.

MOFFAT, Justice.

It is again necessary to say this is an action for the wrongful death of Joseph Sessions, a minor son of plaintiff. The facts and principles of law relating thereto were discussed in the opinion when the case was before the court on a former appeal. It is reported in 89 Utah 222, 51 P. 2d 229, 231.

The case comes before us upon a general demurrer as it did on the former appeal. It may be found necessary at times to refer to or quote parts of the opinion in the case when here on the former appeal. After stating, in general, the stated or admitted facts, this court said in relation to allegations of corporate capacity and purposes that:

"It would not appear to be necessary to plead the nature of a corporation in order to state a cause of action. A corporation is bound as to its [corporate] purposes by the statements in its articles of incorporation. Whether the articles of incorporation upon their face purport to create an organization for charity or [one] for pecuniary profit may be determined in so far as the corporation is concerned from the articles themselves, and may not be changed or modified by parol evidence; but whether a stranger may show the real character of the association by evidence aliunde the articles [of incorporation] is an open question in this state (*Gitzhoffen* v. *Sisters of Holy Cross Hospital Ass'n,* 32 Utah 46, 88 P. 691, 695, 8 L. R. A. (N. S.) 1161), and one on which there may be diversity of opinion. Incidentally, this latter will be involved in the further discussion of the principal question. For a complaint to be good against a general

demurrer, we think a plaintiff is not required to plead, in so far as corporate existence is concerned, the nature or purposes of the corporate defendant."

In the former opinion, it was also said:

"The fact that an association is organized with or without capital stock is a matter of proof, and as such may weigh for or against its claimed charitable character. So may the matter of whether the institution exacts payment for all patients, or only a part of them, or none of them. So may the manner and amount of profits or accumulations, if any, and the purposes and manner of distribution or use thereof, whether the institution may be privately owned and the nature of that ownership and use, the activity engaged in—all are matters of evidence. The use or service to which the institution devotes its property, and the ultimate ends to be attained, may be important for consideration."

The foregoing and other statements made in the opinion were directed to matters that may be considered in determining the type or character of the institution, as an institution.

After the remittitur was filed and the demurrer to the complaint was overruled in pursuance of the order of the court, the plaintiff, without waiting for the defendant to answer or set forth its character, asked and obtained permission to file an amended complaint. This was allowed. Because of the completeness with which all the facts are alleged, and the point to which the issue has been narrowed, although lengthy, it is deemed worth-while to set out much of the complaint and the exhibits as found in the transcript, condensed as much as possible consistent with retention of the historical or narrative part of the complaint, the facts alleged tending to construct a charitable institution, and the matters presenting the cause of action arising out of negligence upon which the claimed right to recover is based.

The Thomas D. Dee Memorial Hospital Association is alleged to be a corporation under the laws of Utah, and engaged in maintaining, operating, and conducting a general hospital; caring for sick, injured, diseased, and infirm per-

sons or others for which compensation is charged and received. Other powers and purposes are indicated to be the power to acquire, own, hold, operate, and invest in and sell real and personal property. Originally the corporation was capitalized for $500,000 and became the owner of certain described real estate. The Thomas D. Dee Company erected the original hospital as a memorial to Thomas D. Dee.

On February 3, 1910, the heirs of Thomas D. Dee formed a corporation known as the Thomas D. Dee Memorial Hospital Association. At that time it is alleged the property was valued at approximately $75,000 and $10,000 was contributed by the citizens of Ogden for equipment. A home and a training school for nurses and student nurses has been acquired and maintained at a cost of approximately $35,000. In 1914 the trustees proposed to return the property to the Thomas D. Dee heirs because of want of sufficient income to continue the operation of the hospital. Learning of the proposed action of the hospital trustees, the presidency of the Weber, North Weber and Ogden Stakes of the Mormon Church offered to accept title to and assume responsibility for the continued operation and maintenance of the hospital, including assumption of the indebtedness. The offer was accepted and the property was conveyed and released from the reversion provisions of the trust and a new board of trustees was appointed by the "Trustee in Trust of the Church of Jesus Christ of Latter Day Saints," pursuant to authority so provided in the amended articles of incorporation.

It is pointed out that during the years 1932 to 1935, charitable services were rendered as follows: 1932—$13,913.87; 1933—$10,712.53; 1934—$9,013.94; 1935—$10,349.70; and that the gross income during the same period from all sources was: 1932—$171,814.38; 1933—$172,018.30; 1934—$201,059.07; 1935—$207,467.49; and that the hospital has expended large sums of money in erecting buildings and securing equipment from funds received from donations and income.

Patients who were able to pay were charged standard charges. Certain societies, by contract, have had patients cared for—especially children—at reduced rates. No dividends or profits have been paid. All resources, including donations, have been used exclusively for the payment of expenses and making improvements. There is no capital stock. No taxes have been assessed against the property or paid since 1914.

"That on or about the 29th day of March, 1934, plaintiff's minor son, to-wit, Joseph Sessions, age six years, was received at the defendant hospital as a patient, and that said defendant undertook for pay, to furnish said minor with board, lodging, operating room, medicines, competent nurses to care for him, and to perform a surgical operation upon said minor, and furnishings and care after said operation.

"That the plaintiff in this case paid the regular charges to the defendant hospital for the care of his son, Joseph Sessions, while his son was confined in said hospital, and that said patient was not a charity patient."

That immediately before the operation was commenced said minor was reduced to a state of unconsciousness by the administration of an anaesthetic and said minor's appendix was removed; that said operation was successful and said minor recovered therefrom.

"That said minor, to-wit, Joseph Sessions, at the time he was admitted to said hospital was of the age of six years, and was a strong, able-bodied boy in perfect health, both mentally and physically, except said appendix ailment, that he was capable and able to render aid, assistance, society and comfort to plaintiff. That he was capable and able to live and reach his majority and to live many years thereafter, with an expectancy to live to the age of approximately fifty-seven years, as shown by the American Mortality Table, and that during all of said time he would be capable and able to render aid, assistance, society and comfort to plaintiff."

That on or about the 30th day of March, 1934, the doctor ordered that said minor be given an injection consisting of one-fourth grain of codeine. That it is the duty of the em-

ployees of said hospital, to wit, the nurses, to administer said drug. That it is the duty of the supervisor of the nurses of said hospital to issue said drug for administering from the medicine room. That at said time and place, an employee of said hospital, who was the supervisor of nurses at the hospital, and another nurse who was an employee of said hospital, had the care of said minor, Joseph Sessions. That the supervisor of nurses, as an employee of the defendant, had full and complete charge and custody of the medicine room belonging to the defendant, which said room contains the medicines and drugs to be furnished for pay to patients of said hospital. That the supervisor of nurses at said hospital had the complete charge and custody of the keys to said medicine room.

That it was the duty of the supervisor of said nurses as an employee of defendant to issue the aforesaid codeine which was to be administered to said minor, but, notwithstanding said duty to issue said codeine, she carelessly and negligently permitted a student nurse, who was then and there training in said hospital to become a nurse, and who had only been in training seven months, to take the keys to said medicine room and to then and there obtain and prepare said codeine, which said codeine, together with other medicine and drugs, was in said medicine room.

That said student nurse carelessly and negligently put up and prepared, instead of the codeine, a drug known as morphine, and then and there administered said morphine by injection of the same into said minor, and that from the effects of said morphine so administered said minor died.

That it was the duty of said defendant hospital, its servants, agents, and employees, to exercise reasonable and ordinary care, skill, and prudence in their conduct and care of said minor. That said defendant hospital, its servants, agents, and employees, failed and neglected to exercise reasonable or ordinary care, skill, and prudence in caring for said minor, and that it negligently, carelessly, and with a lack of ordinary or reasonable care or skill adminis-

tered a poisonous drug to said minor as aforesaid; that by reason of said neglect, carelessness, and negligence and lack of skill on the part of the servants, agents, and employees of the defendant hospital and while under said hospital's employment and within the scope of their employment, and as a proximate result thereof, said minor died. Damages are alleged.

There are attached to the complaint as exhibits an affidavit for the organization of the hospital association constituting its articles of association, by which it is provided that the association has power to receive gifts, donations, devises, and bequests, and charge and receive compensation for nursing and treating patients and to nurse and treat patients free of charge; to hold property, borrow money, execute mortgages, lease and convey real property, and general provisions relating to the operation and maintenance of a general hospital.

To the amended complaint a demurrer was filed, alleging for cause: "That said amended complaint does not state facts sufficient to constitute a cause of action." The demurrer was sustained. The plaintiff elected to stand upon his amended complaint and refused to further plead. The court thereupon entered judgment of dismissal of the action. As heretofore indicated, plaintiff has taken this second appeal.

Three assignments of error have been made to the decision of the trial court. They are:

"I. That the Trial Court erred in sustaining defendant's general demurrer to plaintiff's Amended Complaint, which said demurrer is in the following language:

"That said Amended Complaint does not state facts sufficient to constitute a cause of action against this demurring defendant:

"(1) For the reason that plaintiff in his Amended complaint endeavored to set forth the organization, incorporation, and general operation of the defendant hospital, to show how said defendant hospital came into existence, under what circumstances it was incorporated, and the general operation thereof, including the reception of patients for pay for treatment and for operation, and that the de-

fendant hospital charged and received compensation for nursing and treating patients, and that its Articles of Incorporation authorized it to sue and be sued.

"(2) Also showing the gross annual income of said hospital during the years of 1932 to 1935 inclusive, as well as the amount of charity dispensed through hospitilization for said years.

"(3) Also the amounts of money spent for improvement to said hospital from the year 1915 to and including the year 1929.

"(4) That said defendant hospital expects every person admitted to said hospital to pay the regular rates but that it does not always receive said money but aims to collect it in all cases.

"(5) That defendant through its attorneys argued before the District court that an eleemosynary or charitable institution is not liable for the negligence of itself or its servants, agents, or employees, except negligence in the selection of its said servants, agents, or employees, to-wit, its nurses. The adjudicated cases in the State of Utah have definitely decided that where a hospital received a patient for pay or compensation, it is precluded from making the claim that the patient was received and treated by it through mere charity. The defendant having demurred generally to the plaintiff's Amended complaint, admits the truth of all of the allegations of the Amended complaint; that paragraph XIX alleges 'said defendant undertook for pay to furnish said minor with board, lodging, operating room, etc.,' and this admission of the defendant has the effect of precluding the defendant from making the claim that the patient was received and treated by it through mere charity, because the defendant cannot admit that it received the patient for treatment for pay and then claim that it received the patient gratuitously.

"II. The Trial court erred in sustaining said general demurrer and in giving plaintiff the right to file a second Amended Complaint:

"(1) On the grounds and for the reason that the general demurrer under the laws and decisions of this State admit the truth of the allegations of plaintiff's Amended Complaint, and we submit that said Amended Complaint, which sets forth facts sufficient to enable the Court to determine the organization, incorporation, and general operation of said hospital, does state a cause of action.

"(2) That under and by virtue of the allegations contained in Paragraphs XIV, XVI, and XIX and XX of plaintiff's Amended Complaint, to-wit: That patients are charged the standard charges for hospitalization and that the defendant hospital received the minor son of plaintiff as a patient for pay and that the plaintiff paid to said hospital the regular charges for the care of his son and that said patient was not a charity patient, stated a cause of action and showed that defendant hospital was not charitable or eleemosynary.

"(3) It is now definitely shown through those paragraphs as well as the other allegations in said Amended Complaint that by the operation of said defendant hospital, it is not a charity or eleemosynary institution, and we further submit that the District Court could not assume from said Amended Complaint that the defendant hospital was a charitable or eleemosynary institution but that said District Court should have found from the allegations of plaintiff's Amended Complaint that defendant hospital was not a charitable and not an eleemosynary institution.

"III. The Trial Court erred in signing, filing, and entering its order and judgment dismissing said action for the reason as stated in our support of assignments I. and II. herein and for the further reason that said demurrer should have been overruled and the defendant given time to answer plaintiff's Amended Complaint."

It may appear somewhat superfluous to state so fully the pleadings. It is apparent, however, that the purpose of the pleading was to allege facts from which it may be inferred or concluded that an institution is a charitable one in so far as its purposes and aims are revealed from what may be termed its internal organization aspects, or its institutional setup as an institution is concerned, and as revealed by the alleged powers, functions, aims, and operations of the defendant, are competent and material in characterizing an institution.

When an institution, association, person, or corporation undertakes by contract for pay to perform a specified service, such as set out in the plaintiff's complaint, may the defense of a "charitable" shield, as against a pleaded and admitted negligence, be invoked? Direct answer to this question was not necessary to the decision of the former appeal. Mr. Justice Folland was of the opinion that we had come too near to an answer without an answer; and Mr. Justice Wolfe was of the opinion that the question should have been fully answered on the former appeal. Be that as it may, the court was unanimous in the opinion that the former complaint stated a cause of action. The question again here is: Does the complaint, the allegations of which have been summarized, state a cause of action?

Reference to the former opinion may be had for a discussion of many of the cases cited in the instant case. No attempt will be made to classify the cases, at least more than in a general way. Harmonize them, we cannot. The most, in fact the only thing, that may be done, is to select the basic principle and then accept the conclusion, lead where it may.

In the law of tort—particularly that branch relating to unintentional harm, commonly referred to as negligence—when one invades the interest of another to his damage, a cause of action is said to arise in favor of the one injured and against the one or those responsible for the injury. The elements of a cause of action for negligence as stated in the Restatement of the Law of Torts, § 281, vol. II, are:

"The actor is liable for the invasion of an interest of another if: (a) the interest invaded is protected against unintentional invasion, and, (b) the conduct of the actor is negligent with respect to such interest of the other which is protected against unintentional invasion, and, (c) the actor's conduct is a legal cause of the invasion, and, (d) the other has not so conducted himself as to disable himself from bringing an action for such invasion."

As a comment in explanation of the foregoing, it is stated:

"a. Clauses (a) and (b) state the conditions necessary to make the actor's conduct negligent. Clauses (c) and (d) state the conditions which are necessary to make negligent conduct actionable."

In many jurisdictions some rules, or probably better stated, some exceptions, to the resulting liability of such an invasion in the case of a charitable or eleemosynary institution, have been recognized. But why should a charitable institution be excepted? Perry on Trusts says:

"It is almost universally held that those who are receiving the benefits of the charity, for example, patients, at a charitable hospital or pupils at a school or college which is a public charity, cannot recover from the corporation or from the trustees for injuries due to the negligence of an employee, where it does not appear that there was negligence in selecting the employee." Vol. 2, 7th Ed., § 745.

The cases from some of the jurisdictions put this immunity from liability as stated on the basis of what is referred to as the trust fund theory. Some deny liability for negligence on the basis alone of the institution being charitable, yet permit certain exceptions. Others put the immunity upon the basis of the institution being charitable coupled with the idea that it is desirable to relieve such institutions from liability as a public policy.

Such public policy is declared as to the matter of exemption of property from taxation "used exclusively for either religious worship or charitable" purposes by the Constitution of Utah, art. 13, § 2. The probable weight of authority and the numerical preponderance of cases is to the effect that strangers and third persons not beneficiaries may recover against a charitable institution as against an ordinary corporation or individual for negligence; and it is not a defense that the charity had exercised due care in the selection of its servants. It is, however, generally held that, as to beneficiaries, if the charity had exercised due care in the selection of its servants, the recipient of the charity may not recover in an action against the charity.

We shall probably arrive at as consistent a conclusion as any if we accept the principles announced in the cases and then apply the law as thus announced to the facts submitted to us in the instant case, bearing in mind that we are determining not whether the plaintiff may not or may ultimately recover a judgment, or be able to satisfy such judgment when recovered, but only as to whether the complaint states facts sufficient to constitute a cause of action in negligence for a service undertaken on contract for pay, notwithstanding that, internally, it may be classed as a charity, nevertheless is authorized by its articles of association to sue and be sued and to receive, treat, and care for patients and collect a compensation therefor. Is it exercising a charitable function as a matter of law under the facts stated? Among the declared purposes of the defendant association are the following:

"* * * maintaining, operating, and conducting hospitals and other institutions for the care and treatment of sick, wounded, injured and infirm persons; * * * to receive gifts and bequests; * * * to charge and receive compensation for nursing and treatment of patients; to nurse and treat patients free of charge whenever, in the opinion of the Board of Trustees, they are worthy objects of charity; to have and exercise all the rights, powers and privileges given to such a corporation by common law; to sue and be sued; to borrow money and secure the payment thereof by notes, mortgages and deeds of trust upon the personal and real property of the corporation; * * * provided, however, that in no event shall any profit result from the management or operation of this Association, or any of its hospitals or properties, to the incorporator herein or to any other person except the general public, for whose benefit this Association has been organized and its initial gift accepted; and all monies received by this association from any source whatever, in excess of the actually necessary expenses and disbursements required for carrying out the objects of this Association, shall be used and held for the sole benefit and advantage of said Association, in furthering and extending of the charitable purposes for which it has been organized."

When this case was before us on the former appeal (89 Utah 222, 51 P. 2d 229) it was stated:

"The facts that may ultimately be determinative of the type of institution [referred to in the complaint], are not before us. The allegations of the complaint are the facts for the purpose of the demurrer."

The allegations of the complaint in the present appeal attempt to push the question one step further and apparently have attempted to allege that the defendant is a charitable institution in so far as its organization, aims, and purposes are concerned, and still, that it may "charge and receive compensation for nursing and treatment of patients." Granting that an institution's aims and purposes are purely charitable in so far as its articles of agreement may declare them and yet in its operations it undertakes services for a consideration, is it a question of law or one of fact to be determined by the court or jury from the evidence, when both the organization, aims, and purposes of

the institution are alleged, and the evidence of contractual operations have been submitted to the court or the court and jury? We stated substantially the same problem in the former appeal when it was said:

"Once it is established, the institution, society, association, or corporation is charitable, and so, pursuing its purpose, the law of immunity seems to be settled. The question here submitted is: Does the contract for 'pay' take the institution out of the protection of the rule, or, in so far as the contract for pay is concerned, make the institution a business institution not subject to the charitable immunity?"

We then stated that the question as stated was too narrow for complete answer, and proceeded to say:

"Whether or not that character attaches, it seems to us, is a matter of proof under all the circumstances of the case."

In the case of *Gitzhoffen* v. *Sisters of Holy Cross Hospital Association,* 32 Utah 46, 88 P. 691, 695, 8 L. R. A., N. S., 1161, Mr. Justice Straup, speaking for the court, said:

"We are not concerned with the question whether a stranger to a corporation may show the real character of the association by evidence aliunde the articles. The only question in this respect before us and decided by us is that the corporation itself may not do so."

It would seem to follow that the character of an organization, in so far as a party other than the corporation itself may show it, is not only what the provisions of the articles are, but also what the corporation actually does in striving to arrive at its purposes, aims, and functions, as long as what it actually does is within its authorized powers. (Thus eliminating any question of ultra vires.) Aside from determining that the corporation was one organized for profit, as shown by its articles of incorporation, and that the defendant had been negligent, and while discussing at some length the cases relating to charitable institutions, much of what is said in the Gitzhoffen Case, supra, is dicta.

The case of *William Budge Memorial Hospital* v. *Maughan, County Treas.,* 79 Utah 516, 3 P. 2d 258, 261, on

rehearing, 13 P. 2d 1119, is a taxation case. It was there sought to obtain tax immunity upon the ground the corporation was a charitable institution and therefore exempt under the Constitution of Utah cited supra. In discussing the questions and elements that constitute a charity, the court said:

"The test which determines whether a hospital is charitable or otherwise is its purpose, that is, whether it is maintained for gain, profit, advantage, or not. 30 C. J. 462; *Union Pac. R. Co.* v. *Artist* (C. C. A.) 60 F. 365, 23 L. R. A. 581. The question whether a hospital is maintained for the purpose of charity or for profit is to be determined, in case the hospital is incorporated, *not only from its powers as defined in its charter, but also from the manner in which it is conducted.* 30 C. J. 462, *Stewart* v. *Cal. Med. M. & B. Ass'n,* 178 Cal. 418, 176 P. 46; *Bishop & Chapter of Cathedral of St. John the Evangelist* v. *Treasurer, etc.,* 37 Colo. 378, 86 P. 1021. But the corporation itself is concluded by the declaration of its charter in respect to its purpose and object. *Gitzhoffen* v. *Sisters of Holy Cross Hospital Ass'n,* 32 Utah 46, 88 P. 691, 695, 8 L. R. A. (N. S.) 1161; 11 C. J., 304; *In re Loeb's Estate,* 167 App. Div. 588, 152 N. Y. S. 879; *In re Altman's Estate,* 87 Misc. 255, 149 N. Y. S. 601, page 604." (Italics added.)

And, further, at page 525 of 79 Utah, 3 P. 2d 258, 262, 13 P. 2d 1119, it is said:

"The mere fact that the property is used for hospital purposes is not sufficient to exempt it from taxation, as all hospitals are not charitable institutions. They may be and often are maintained and conducted for pecuniary profit. The fact that the declared purpose for establishing this hospital was for the care and treatment of the sick and injured is not itself controlling, for this may be and frequently is done for profit."

The people of the state saw fit in adopting the Constitution to provide for exemption of property used exclusively for charitable purposes from taxation. Neither constitutional nor statutory provisions exempt a charity from liability for negligent conduct. To exempt a person or corporation from a tort liability is a different matter from exempting property or persons or certain corporations from

taxation. Negligent conduct on the part of an actor, personal or corporate, is a type of unintentional tort.

Unless put upon the broad ground of public policy sufficiently and definitely characterized as such, as related to the things done, we fail to find ground upon which to excuse one from negligent conduct when falling within all of the elements constituting a cause of action as heretofore stated. Put otherwise, where a contract involves ■ an agreement to perform a service for compensation or pay, although the general purposes of the actor may be charitable, yet, in the particular instance the general character or purposes of the actor may not without more be invoked as a defense as a matter of law against actual negligence, whether pleaded in the complaint or by way of answer or defense. There are instances where a given agreement may partake so largely of compensatory or profit-taking elements as to remove the activity from the charitable field. Instances will readily occur, one of which may be where the services are critical but comparatively simple, and a compensation beyond a reasonable one for either service, technical skill, or responsibility, and the profits are considerable yet not a gift. There are combinations where the contract for service so preponderates as to justify the conclusion that the actor was performing a pure charity. In the case of the good Samaritan it was not the wounded man who "fell among the thieves," who sought care from the innkeeper; nor was it the keeper of the inn nor the wounded man who said, "Take care of him; and whatsoever thou spendest, more, when I come again, I will repay thee."

A recent Idaho case is strikingly analogous in its facts to the instant case. The facts there stated are: A patient entered a Twin Falls county hospital for an operation for appendicitis as a pay patient. Following the operation her physician prescribed an injection in excess of a quart of normal saline solution. Pursuant to the prescription and the directions, the special nurse went to the room in the hospital where medicines were kept and requested the employee

in charge of dispensing medicines to supply her with the saline solution prescribed by the physician. The employee in charge of the medicines and room gave the nurse a container, unlabeled, containing a liquid similar in appearance to the normal saline solution, but which actually contained boric acid. The boric acid was injected into the patient, which caused a sloughing off of the flesh, with resulting sores, and leaving scars. Other effects were alleged as injurious results because of the error. An .action by the patient was brought against the hospital for damages based upon negligence.

It is stated in the opinion dening a petition for a rehearing that the court was dealing with a purely nongovernmental business transaction, voluntarily assumed by the county, and that the maintenance of a hospital by the county was not a mandatory duty; yet the arguments and body of the main opinion involve propositions pertinent to the issues presented in the instant case in principle. *Henderson* v. *Twin Falls County*, 56 Idaho 124, 50 P. 2d 597, 600, 101 A. L. R. 1151, 1156:

"It is contended by respondent that it is a charitable institution, in that it cares for the indigent sick, and therefore that it is not liable for the negligence of its employees. In *Geiger* v. *Simpson Methodist-Episcopal Church*, 174 Minn. 389, 219 N. W. 463, 464, 62 A. L. R. 716, the Supreme Court of Minnesota, discussing the question of the exemption of charitable institutions from liability for the negligence of their officers and servants, says that 'we find a great diversity of reasoning and adjudication in the numerous decisions in various states. One line of cases holds that these organizations are wholly exempt from liability for such negligence. Another line of cases, apparently the greater in number, holds that these organizations are exempt from such liability to persons who are recipients of their charity or service, who are beneficiaries of the work carried on by the organization. Many of these cases hold that the organization is liable to third persons, who are not beneficiaries, and to its own hired servants and employees on the same basis as private individuals and business corporations. Some cases hold that hospitals and colleges are liable to patients or students who pay full consideration for their treatment or tuition. Others hold that the fact that payment is so

received does no make them liable. In many cases it is stated that such institutions may be held liable for failure to exercise proper care in the selection of officers and servants, and may be held liable for negligently employing incompetent officers and servants, when injury results therefrom. Different courts give different reasons for the exemption from liability. The following reasons have been given; That the funds of such institutions are held in trust for specific charitable purposes and should not be diverted to pay damages for negligence; that the better public policy is to hold them exempt; that they serve the same purpose as governmental agencies and should come under the same rule; that one who accepts benefits by becoming a patient, student, or beneficiary of the institution, impliedly consents to hold it exempt or to waive any claim for negligence of its servants; that the doctrine of respondeat superior does not apply to them; that their employees are not, in a legal sense, servants of the organization. Other grounds of exemption have been suggested. All of these reasons have been more or less criticized.'

"Numerous cases involving the question of the tort liability of charitable institutions are collected and analyzed in *Roosen* v. *Peter Bent Brigham Hospital*, 235 Mass. 66, 126 N. E. 392, 14 A. L. R. 563, 572; *Love* v. *Nashville Agricultural and Normal Institute*, 146 Tenn. 550, 243 S. W. 304, 23 A. L. R. 887; *Taylor* v. *Flower Deaconess Home and Hospital*, 104 Ohio St. 61, 135 N. E. 287, 23 A. L. R. 900; *Weston's Adm'x* v. *Hospital of St. Vincent of Paul*, 131 Va. 587, 107 S. E. 785, 23 A. L. R. 907, 923; *Bachman* v. *Young Women's Christian Ass'n*, 179 Wis. 178, 191 N. W. 751, 30 A. L. R. 448, 455; *St. Vincent's Hospital* v. *Stine*, 195 Ind. 350, 144 N. E. 537, 33 A. L. R. 1361, 1369; *Hamburger* v. *Cornell University*, 240 N. Y. 328, 148 N. E. 539, 42 A. L. R. 955; *St. Mary's Academy* v. *Solomon*, 77 Colo. 463, 238 P. 22, 42 A. L. R. 964; *Roberts* v. *Ohio Valley General Hospital*, 98 W. Va. 476, 127 S. E. 318, 42 A. L. R. 968; *Williams' Adm'x* v. *Church Home*, 223 Ky. 355, 3 S. W. (2d) 753, 62 A. L. R. 721, 724; *Greatrex* v. *Evangelical Deaconess Hospital*, 261 Mich. 327, 246 N. W. 137, 86 A. L. R. 487, 491.

"It is further contended by respondent that, being a charitable institution, engaged in caring for the indigent sick, the fact that appellant was a pay patient does not subject it to liability for the negligence of its employees. In the well-considered case of *Tucker* v. *Mobile Infirmary Association*, 191 Ala. 572, 68 So. 4, L. R. A. 1915D, 1167, where the authorities are fully and carefully reviewed and analyzed, it was held that a pay patient in a hospital conducted without profit, in which indigent patients were treated without cost, the fees exacted from patients able to pay being used to promote the work, could recover damages for an injury done him through the neg-

ligence of an attending nurse. And in *Mulliner* v. *Evangelischer Diakonniessenverein of Minnesota Dist. of German Evangelical Synod of North America*, 144 Minn. 392, 175 N. W. 699, where the hospital operated by that institution was founded, and the buildings erected, partly by money donated, and partly by money borrowed, the hospital not being operated for profit, but most of its patients being pay patients, it was held that the institution was liable in damages for the death of a pneumonia patient who, while suffering from delirium, was left alone in a second story room, jumped out of an open window, and was killed. See, also, *Cohen* v. *General Hospital Soc. of Connecticut*, 113 Conn. 188, 154 A. 435."

A county is an arm of the state. A hospital was established and maintained as authorized but not required to by the Idaho statute. Under the Idaho statute, counties were authorized, when further authorized by a vote of the people of the county, in addition to caring for indigent and charitable patients, to "accept other patients insofar as their facilities will permit and may charge and accept payment from such * * * patients." Code Idaho 1932, § 30-3303. The Idaho case, supra, held the county liable for negligence of its employees, denied the shield of immunity, because not performing a governmental function, and carries us into the field where public service so rendered by an institution for pay is taken out of the field of public protection policy. A charity is held not to be immune for negligence of its servants, even when that institution is conducted by an arm of the state under powers granted to do so.

The court was in error in sustaining the demurrer. The complaint states all the elements of a cause of action for negligence. The cause is remanded to the trial court, with directions to overrule the demurrer. Costs to appellant.

LARSON, J., concurs.

WOLFE, Justice (concurring).

I concur. Assuming, for the purpose of this case, that the allegations of the complaint show a hospital operated

not for profit, the question is: Shall the institution be exempt from the operation of the doctrine of respondeat superior where an employee, although selected with due care, has by her negligence caused the death of a patient who has paid the standard and full rate for hospital room, board, and services?

I think the doctrine of respondeat superior should apply. This doctrine, as we stated in *Fox* v. *Lavender,* 89 Utah 115, 56 P. 2d 1049, 109 A. L. R. 105, was based on the theory that, where one acted for the master in pursuance of the master's business and within his authority, it was in contemplation of law as if the master itself were doing the act. The principle is thoroughly grounded in law. Should a case such as this be exempted from the doctrine? I think not. Whatever may have been the reasons assigned by courts for exempting hospitals operated not for profit from the consequences of the doctrine, the real reason was public policy. That funds held in trust for specific charitable purposes should be exempt is another way of saying that it is the better public policy to exempt such trust funds. It is not because there is a trust. A trustee for profit is amenable to the doctrine of respondeat superior. Likewise, the theory that such institutions serve the same purpose as a governmental agency is but another guise for holding that it is good public policy to exempt them from the application of the doctrine. It results, therefore, that we but need to determine whether in this day and age public policy demands that we exempt hospitals from the application of the doctrine.

A review of the history of the cases exempting hospitals not for profit, because of public policy, shows that it originated in a day when there were comparatively few charitable institutions apart from the great ecclesiastical organizations; that encouragement to those inclined to give to or create philanthropies was quite necessary; that ofttimes the charitable institutions were small with but meager funds. A single negligence action might have wiped them out.

The same reasons do not pertain today. It would be rare indeed that any philanthropist would fail to give to a charitable use because he feared that the institution he created or contributed to might be sued for negligence and some of its funds required to compensate for negligence. More likely would he say: "If the institution I create or give to, through its servants, injures another, it is only just that it make compensation with my funds before it uses them for the help of others. Better justice with the funds at home than charity abroad." Hospitals may protect themselves by liability insurance.

. The CHIEF JUSTICE has cited a formidable array of authorities holding contra to the prevailing opinion in this case. I concede the great weight of authority is that way. An examination of many of the cases, I surmise, will reveal that they adopted language imported from some previous case which had in turn adopted language from still earlier cases. Few examined the question in the light of modern conditions. There was a certain amount of judicial "goose-stepping." But I think the trend is the other way, and I think in the not too distant future the weight of authority will be the other way. I am in favor of throwing this jurisdiction on the side of Alabama, Idaho, Minnesota, Oklahoma, and the trend in New York.

It is true that a hospital may not show dividends or profits "accruing to any person or corporation," but it may show an excess of intake over outgo over a series of years and absorb that recurrently in additions to the hospital or in other professed philanthropic ventures. In such case it could hardly be said that the hospital contributed toward the maintenance of the pay patient, and it could not the more be said because there could never under its articles be a distribution of any earned excess or division of the reversion among private individuals. I opine that the "Good Samaritan" would not have been quite such a "Good Samaritan" if he had said, "Come to my hospital. I will

charge you for your keep and attention and a little more to help build a new wing on my hospital, and for that I shall expect the state to grant me immunity from the principle of respondeat superior which binds all businesses operated for profit." In the parable the innkeeper received his full pay. He was not doing charity. And I assume that, if the inn had cared for some indigent guests without charge but fixed its charges for the paying guests so that it could come out even, it would not be said to be a charitable institution although doing some charity. I apprehend that a hospital running a store for profit would not be exempt from responsibility for negligence of its servants in the store because it used the profit, if any, to build more hospitals.

I mention these considerations only because it seems to me that the CHIEF JUSTICE presumes that all hospitals that do not, or cannot, by their constitution, pay a dividend or profit to individuals or corporations are suffering from deficits. I do not say that the Dee Hospital is not a charitable institution. Some years it had a deficit; other years there was a surplus. Surpluses went to make up deficits or for improvements. I do not know, and there is no way to tell from the pleadings, whether the deficits came because of the number of nonpaying or reduced-rate patients or because the full rate was subsidized through donations. For this reason I cannot see how the CHIEF JUSTICE can presume from the pleadings that the Dee Hospital extends the benefits of charity to the "rich, the middle class and the poor alike." While this hospital may reduce its full rates below the level of cost, other hospitals may charge all that the traffic will bear and still denominate themselves as charitable institutions. For my purpose, it makes no difference. I think they should pay for the damage that they cause to those patients who are intrusted to their care and pay the full rates. But without more evidence I cannot permit to go unchallenged the presumption that full-pay patients are themselves partial objects of charity in all

hospitals where a profit cannot be paid and the reversion never be distributed to private individuals.

The question of "the law of the case" presents difficulties. In the former appeal, I took the position that the question now decided in this case should have been decided there. If, in that opinion, we had arrived at the same decision as we come to in this appeal, this appeal might have been prevented. That decision stated:

"The authorities are reviewed and interpreted. A division and diversity of opinion is recognized. It will be proper and sufficient to pass upon such questions when evidence is available to apply the law as we find it in a proper case." 89 Utah 222, 51 P. 2d 229, 232.

Thus, the opinion appears to reserve the point. True, it did remark that "the evidence of the manner in which it is conducted and the purposes, aimed to be accomplished may show that it is a charitable institution and entitled to immunity or may not." But the decision as distinguished from the opinion decided that the complaint stated a cause of action good against general demurrer. This would not mean that, if amended to show an eleemosynary institution, the demurrer would have been good, although I must admit that certain statements in the opinion imply that it would be. But I think the opinion too ambiguous in that regard to meet the requirements of the principle of "the law of the case." The writer in a partly dissenting opinion expressed himself definitely to the effect that the opinion should unambiguously decide the point here decided. Evidently counsel in this case were not sure that the point had been decided, expressly or by implication, because they reargued it at length in this appeal.

For the reasons stated herein, I concur.

FOLLAND, Chief Justice (dissenting).

I dissent. My understanding of the majority decision is that the defendant hospital is held liable for any negligence of its nurses where the injured patient is a so-called paying

patient, irrespective of the character of the institution, whether a charitable or eleemosynary hospital or one operated for profit. Stated in another way, that no charitable institution is immune from liability for negligence of its servants where the person injured by such negligence has paid or contracted to pay for the hospital services. If this be the correct analysis of the decision, then it is wholly unnecessary to determine whether defendant is a charitable institution or one organized and operated for profit since the rule of liability will be the same in either event.

Believing as I do that it is the law that a charitable institution is not liable to its patients for negligence of its nurses where reasonable care has been exercised in their selection, it becomes a matter of importance to determine whether the defendant hospital is charitable or eleemosynary in character. I believe that defendant hospital is of such character and, therefore, that it is immune from liability under the facts of this case.

The test of character has been variously stated, but all lead to the same end. This court, speaking through Mr. Justice Ephraim Hanson in the case of *Budge Memorial Hospital* v. *Maughan*, 79 Utah 516, 3 P. 2d 258, 261, rehearing denied 13 P. 2d 1119, stated:

"The test which determines whether a hospital is charitable or otherwise is its purpose, that is, whether it is maintained for gain, profit, advantage, or not. 30 C. J. 462; *Union Pac. R. Co.* v. *Artist* (C. C. A.) 60 F. 365, 23 L. R. A. 581. The question whether a hospital is maintained for the purpose of charity or for profit is to be determined, in case the hospital is incorporated, not only from its powers as defined in its charter, but also from the manner in which it is conducted. 30 C. J. 462; *Stewart* v. *Cal. Med. M. & B. Ass'n*, 178 Cal. 418, 176 P. 46; *Bishop & Chapter of Cathedral of St. John the Evangelist* v. *Treasurer, etc.*, 37 Colo. 378, 86 P. 1021. But the corporation itself is concluded by the declaration of its charter in respect to its purpose and object. *Gitzhoffen* v. *Sisters of Holy Cross Hosp. Ass'n*, 32 Utah 46, 88 P. 691, 695, 8 L. R. A., N. S. 1161; 11 C. J. 304; *In re Loeb's Estate*, 167 App. Div. 588, 152 N. Y. S. 879; *In re Altman's Estate*, 87 Misc. 255, 149 N. Y. S. 601, page 604."

The decision in the Budge Case quoted with approval from *Congregational Sunday School & Publishing Soc. v. Board of Review,* 290 Ill. 108, 125 N. E. 7, 10, as follows:

"A charity is a gift to the general public use which extends to rich as well as the poor. The test of a charity and the test of a charitable organization are in law the same. The principal and distinctive features of a charitable organization are that it has no capital stock and no provision for making dividends or profits, but derives its funds mainly from public and private charity, and holds them in trust for the objects and purposes expressed in its charter."

In the headnote of *Southern Methodist Hospita and Sanatorium of Tucson v. Wilson,* 45 Ariz. 507, 46 P. 2d 118, 119, the court states as follows:

"Test of whether institution is charitable so as not to be liable for negligence of its servants is whether institution exists to carry out purpose recognized in law as charitable, or whether it is maintained for gain, profit, or private advantage.

"Word 'charity' has been defined as a gift to a general public use, which extends to the poor as well as to the rich. When charity is to be extended, not sporadically and to a few individuals, but to a large number over a long period of time, it is generally administered by some association, corporation, or institution, and principal and distinctive features of institutions of this character are that they have no capital stock and no provisions for making dividends or profits, but derive their funds to a considerable degree at least from public and private charities, and above all, that they hold them in trust for the obligation of the institution."

From these decisions it is apparent a hospital does not acquire its charitable character merely from an occasional act of charity in the form of hospitalization or treatment of a poor person who is not required to pay anything for such services, but from the system of organization and operation of the institution which extends the benefits of the charity to the public—to the rich, middle class, and poor alike. Such an institution is the Thomas D. Dee Memorial Hospital. Because of the original donation on which it was founded and the frequent contributions from year to year

by the L. D. S. Church and individual donors, it has been able to offer its beneficent services to the public at a reasonable cost because it is an eleemosynary institution and is under no necessity of earning profits or paying dividends. True, the articles of incorporation and charter will characterize a corporation as one for profit or as eleemosynary, and, if it be one organized for profit, the hospital association may not show that in practice it is something else. *Gitzhoffen* v. *Sisters of Holy Cross Hospital Ass'n,* 32 Utah 46, 88 P. 691, 8 L. R. A., N. S., 1161; *Hamilton* v. *Corvallis General Hospital Ass'n,* 146 Or. 168, 30 P. 2d 9. On the other hand, a patient injured through negligence of a nurse may show by evidence aliunde the charter that an institution organized as eleemosynary is in fact operating its business for profit. *Southern Methodist Hospital and Sanatorium of Tucson* v. *Wilson,* supra. Where the hospital derives its funds mainly from public and private charity and holds its property in trust for the object specified by its donors, and is not conducted for gain, profit, or private advantage, it is generally regarded as charitable. 11 C. J. 303. If organized and conducted as a profit institution, it does not become an eleemosynary institution because it sometimes accepts a charity patient. 11 C. J. 464.

The facts from which a finding of character may be made are all pleaded in the plaintiff's complaint and admitted by the defendant's demurrer. The trial court found the defendant to be charitable in character. There is ample evidence in the record to support such a finding as may be shown by the following summary of facts:

The Thomas D. Dee Memorial Hospital Association was organized in February, 1910, by the Thomas D. Dee Company, an investment company of which the heirs of Thomas D. Dee were the stockholders. The incorporation was under the statute providing for incorporation of "Societies and associations where pecuniary profit is not their object." The articles of incorporation complied in all respects with the statute. At the time of incorporation the Thomas D. Dee Company con-

veyed by deed of gift to the Hospital Association certain real estate together with the buildings erected thereon and all the equipment therein. These buildings had been erected and furnished with hospital equipment at a cost of approximately $75,000, $10,000 of which had been contributed by the citizens of Ogden City. In 1914 the trustees of the hospital association adopted a resolution to discontinue the operation of the hospital and turn the property back to the Thomas D. Dee Company because of the increasing debt being incurred in spite of the "liberal donations made from time to time by Mrs. Annie T. Dee, and by the Thomas D. Dee Company." The indebtedness at that time was in excess of $20,000. In order to prevent the discontinuance of the hospital, the presidencies of the Weber, North Weber, and Ogden Stakes of the L. D. S. Church agreed to assume the debts of the hospital and to perpetuate the memorial as to all the property then existing as well as any future acquired property or buildings if the hospital association would transfer its property to the organization formed or designated by the three presidencies to take over such property and continue the hospital. This was immediately done, the new board of trustees being appointed by the trustee in trust of the Church of Jesus Christ of Latter Day Saints, "by and pursuant to authority as set out in the amended articles of incorporation." Since that time more land has been acquired and improvements made to the building, the cost of which has been borne by contributions from the citizens of Ogden City, and the L. D. S. Church, together with funds contributed by the hospital association itself from its operating fund. The entire property is impressed with a trust to perpetually maintain the hospital to serve the public of Ogden. Since its reorganization, the hospital association has rendered a great deal of charity work, although ordinarily patients are charged the regular fee for hospital services. Charitable organizations in the city have received hospital services for their charges at greatly reduced rates, and the schools of Weber county receive the benefits of a clinic for

school children and hospitalization for indigent persons at a cost of only $120 per month which is paid by Weber county. During the entire time that the hospital has been conducted, there have been no dividends nor profits accruing to any person or corporation, but it has been necessary to receive from time to time donations and contributions in order to continue the operation of the hospital and make improvements. Since the reorganization in 1914 there has been no assessment of taxes against the property of the hospital association.

There should be no question but that the Dee Memorial Hospital is a charitable hospital because it must perpetrate the charitable trust and devote all moneys and property to that end. There is no way in which it can declare profits or dividends, expend money for anything except what is necessary and proper to carry out its charitable purposes. It cannot bring about a dissolution and divide the assets among private individuals or corporations. An important factor in determining whether the hospital is a charitable institution is that it is organized for a charitable purpose and endowed with a trust to carry out this purpose for the use and benefit of the public, without regard for private gain or profit, and without ultimately reverting back into the hands of private individuals to divide the assets among themselves. *Southern Methodist Hospital & Sanatorium of Tucson* v. *Wilson,* supra, affirmed on second appeal in Ariz. 77 P. 2d 458.

The next question to consider is the rule of immunity. This court in its majority opinion in the present case on the first appeal stated: "The courts of this country have generally held that hospitals organized for charitable purposes are not liable to their patients for injuries from the negligence of their employees, when reasonable care is used in the selection and retention of an employee. *Gitzhoffen* v. *Sisters of Holy Cross Hospital Ass'n,* supra."

This holding is supported by a great majority of the cases and by the larger number of jurisdictions. The following

cases, involving the question of liability of charitable hospitals for the negligence of their servants whereby paying patients have been injured, exempt the hospital from liability:

Arizona: *Southern Methodist Hospital & Sanatorium* v. *Wilson*, supra; Arkansas: *Arkansas Midland R. Co.* v. *Pearson*, 98 Ark. 399, 135 S. W. 917, 34 L. R. A., N. S., 317; California: *England* v. *Hospital of the Good Samaritan*, 16 Cal. App. 2d 640, 61 P. 2d 48; *Ritchie* v. *Long Beach Community Hospital Ass'n*, 139 Cal. App. 688, 34 P. 2d 771; *Armstrong* v. *Wallace*, 8 Cal. App. 2d 429, 47 P. 2d 740; Colorado: *Brown* v. *St. Luke's Hospital Ass'n*, 85 Colo. 167, 274 P. 740; Connecticut: *Hearns* v. *Waterbury Hospital*, 66 Conn. 98, 33 A. 595, 31 L. R. A. 224; *Cashman* v. *Meriden Hospital*, 117 Conn. 585, 169 A. 915; Georgia: *Plant System Relief & Hospital Department* v. *Dickerson*, 118 Ga. 647, 45 S. E. 483; Illinois: *Tollefson* v. *City of Ottawa*, 228 Ill. 134, 81 N. E. 823, 11 L. R. A., N. S., 990; Indiana: *St. Vincent's Hospital* v. *Stine*, 195 Ind. 350, 144 N. E. 537, 33 A. L. R. 1361; *Williams* v. *City of Indianapolis*, 26 Ind. App. 628, 60 N. E. 367; Iowa: *Mikota* v. *Sisters of Mercy*, 183 Iowa 1378, 168 N. W. 219; Kansas: *Nicholson* v. *A., T. & S. F. Hospital Ass'n*, 97 Kan. 480, 155 P. 920, L. R. A. 1916D, 1029; *Davin* v. *Benevolent Ass'n*, 103 Kan. 48, 172 P. 1002; Kentucky: *Pikeville Meth. Hospital* v. *Donahoo*, 221 Ky. 538, 299 S. W. 159; *Cook* v. *John N. Norton Memorial Infirmary*, 180 Ky. 331, 202 S. W. 874, L. R. A. 1918E, 647; *Williams' Adm'x* v. *Church Home for Females and Infirmary for Sick*, 223 Ky. 355, 3 S. W. 2d 753, 62 A. L. R. 721; Louisiana: *Thibodaux* v. *Sisters of Charity of the Incarnate Word*, 11 La. App. 423, 123 So. 466; Maine: *Jensen* v. *Maine Eye & Ear Infirmary*, 107 Me. 408, 78 A. 898, 33 L. R. A., N. S., 141; Massachusetts: *Roosen* v. *Peter Bent Brigham Hospital*, 235 Mass. 66, 126 N. E. 392, 14 A. L. R. 563; *McDonald* v. *Mass. General Hospital*, 120 Mass. 432, 21 Am. Rep. 529; Michigan: *Downes* v. *Harper Hospital*, 101 Mich. 555, 60 N. W. 42, 25 L. R. A. 602, 45

Am. St. Rep. 427; *Pepke* v. *Grace Hospital,* 130 Mich. 493, 90 N. W. 278; *Bruce* v. *Henry Ford Hospital,* 254 Mich. 394, 236 N. W. 813; *Greatrex* v. *Evangelical Deaconess Hospital,* 261 Mich. 327, 246 N. W. 137, 86 A. L. R. 487; Mississippi: *James* v. *Yazoo & M. V. R. Co.,* 153 Miss. 776, 121 So. 819; *Mississippi Baptist Hospital* v. *Moore,* 156 Miss. 676, 126 So. 465, 67 A. L. R. 1116; *Pace* v. *Methodist Hospital,* Miss., 1930, 130 So. 468; Missouri: *Adams* v. *University Hospital,* 122 Mo. App. 675, 99 S. W. 453; *Nicholas* v. *Deaconess Home & Hospital,* 281 Mo. 182, 219 S. W. 643; Montana: *Borgeas* v. *Oregon S. L. Ry.,* 73 Mont. 407, 236 P. 1069; Nebraska: *Duncan* v. *Nebraska Sanitarium & Benevolent Ass'n,* 92 Neb. 162, 137 N. W. 1120, 41 N. W. 973, Ann. Cas. 1913E, 1127; New Jersey: *Boeckel* v. *Orange Memorial Hospital,* 108 N. J. L. 453, 158 A. 832; New York: *Mills* v. *Society of New York Hospital,* 212 App. Div. 245, 274 N. Y. S. 233, affirmed 270 N. Y. 594, 1 N. E. 2d 346; *Schloendorff* v. *Society of New York Hospital,* 211 N. Y. 125, 105 N. E. 92, 52 L. R. A., N. S., 505, Ann. Cas. 1915C, 581, affirming judgment, 149 App. Div. 915, 919, 133 N. Y. S. 1143; North Carolina: *Barden* v. *Atlantic Coast Line Ry. Co.,* 152 N. C. 318, 67 S. E. 971, 49 L. R. A., N. S., 801; Ohio: *Lakeside Hospital* v. *Kovar,* 131 Ohio St. 333, 2 N. E. 2d 857, 39 L. R. A., N. S., 427; *Taylor* v. *Protestant Hospital Ass'n,* 85 Ohio St. 90, 96 N. E. 1089; *Taylor* v. *Flower Deaconess Home and Hospital,* 104 Ohio St. 61, 135 N. E. 287, 23 A. L. R. 900; *Walsh* v. *Sisters of Charity of St. Vincents Hospital,* 47 Ohio App. 228, 191 N. E. 791; Oregon: *Hamilton* v. *Corvallis General Hospital Ass'n,* 146 Or. 168, 30 P. 2d 9; Pennsylvania: *Gable* v. *Sisters of St. Francis,* 227 Pa. 254, 75 A. 1087; South Carolina: *Vermillion* v. *Woman's College of Due West,* 104 S. C. 197, 88 S. E. 649; Tennessee: *Wallwork* v. *City of Nashville,* 147 Tenn. 681, 251 S. W. 775; Texas: *St. Paul's Sanitarium* v. *Williamson,* Tex. Civ. App., 164 S. W. 36; *Barnes* v. *Providence Sanitarium,* Tex. Civ. App., 229 S. W. 588; *Baylor University* v. *Boyd,* Tex. Civ. App., 18 S. W. 2d 700; *Steele* v. *St. Joseph's Hos-*

*pital*, Tex. Civ. App., 60 S. W. 2d 1083; *City of McAllen v. Gartman*, Tex Civ. App., 81 S. W. 2d 147; Virginia: *Weston's Adm'x* v. *Hospital of St. Vincents of Paul*, 131 Va. 587, 107 S. E. 785, 23 A. L. R. 907; *Norfolk Protestant Hospital* v. *Plunkett*, 162 Va. 151, 173 S. E. 363; Washington: *Richardson* v. *Carbon Hill Coal Co.*, 10 Wash. 648, 39 P. 95; *Wharton* v. *Warner*, 75 Wash. 470, 135 P. 235; *Bise* v. *St. Luke's Hospital*, 181 Wash. 269, 43 P. 2d 4; West Virginia: *Roberts* v. *Ohio Valley General Hospital*, 98 W. Va. 476, 127 S. E. 318, 42 A. L. R. 968; Wisconsin: *Schumacher* v. *Evangelical Deaconess Society of Wisconsin*, 218 Wis. 169, 260 N. W. 476; *Morrison* v. *Henke*, 165 Wis. 166, 160 N. W. 173; Wyoming: *Bishop Randall Hospital* v. *Hartley*, 24 Wyo. 408, 160 P. 385, Ann. Cas. 1918E, 1172; Federal: *Powers* v. *Massachusetts Homeopathic Hospital*, 1 Cir., 109 F. 294, 65 L. R. A. 372; *Union Pac. Railway Co.* v. *Artist*, 9 Cir., 60 F. 365, 23 L. R. A. 581.

Another group of cases, involving liability of charitable institutions generally for the negligence acts of their employees, lays down the principle that charitable institutions are not liable for the negligent acts of their servants unless there is some other, factor present removing the case from the immunity rule: Arkansas: *Fordyce and McKee* v. *Woman's Christian National Library Ass'n*, 79 Ark. 550, 96 S. W. 155, 7 L. R. A., N. S., 485; Colorado: *St. Mary's Academy of Sisters of Loretto of City of Denver* v. *Solomon*, 77 Colo. 463, 238 P. 22, 42 A. L. R. 964; Georgia: *Jackson* v. *Atlanta Goodwill Industries*, 46 Ga. App. 425, 167 S. E. 702; Illinois: *Parks* v. *Northwestern University*, 218 Ill. 381, 75 N. E. 991, 2 L. R. A., N. S., 556, 4 Ann. Cas. 103; *Johnston* v. *City of Chicago*, 258 Ill. 494, 101 N. E. 960, 45 L. R. A., N. S., 1167, Ann. Cas. 1914B, 339; Indiana: *Old Folks & Orphan Children's Home* v. *Roberts*, 83 Ind. App. 546, 149 N. E. 188; *Winona Technical Institute at Indianapolis* v. *Stolte*, 173 Ind. 39, 89 N. E. 393; Kansas: *Webb.* v. *Vought*, 127 Kan. 799, 275 P. 170; Kentucky: *Emery* v. *Jewish Hospital Association*, 193 Ky. 400, 236

S. W. 577; *Van Pelt* v. *City of Louisville*, 257 Ky. 256, 77
S. W. 2d 942; Louisiana: *Bougon* v. *Volunteers of America*,
La. App., 1934, 151 So. 797; Maryland: *Perry* v. *House of
Refuge*, 63 Md. 20, 52 Am. Rep. 495; *Martin* v. *Moore*, 99
Md. 41, 57 A. 671; *Weddle* v. *School Comm'rs*, 94 Md. 334,
51 A. 289; *Loeffler* v. *Trustees of Sheppard & Enoch Pratt
Hospital*, 130 Md. 265, 100 A. 301, L. R. A. 1917D, 967;
Massachusetts: *New England Sanatarium* v. *Stoneham*, 205
Mass. 335, 91 N. E. 385; *Zoualian* v. *New England Sana-
torium & Benevolent Ass'n*, 230 Mass. 102, 119 N. E. 686,
L. R. A. 1918F, 185; *Glaser* v. *Congregation Kehillath Israel*,
263 Mass. 435, 161 N. E. 619; Michigan: *Bruce* v. *Central
Methodist Episcopal Church*, 147 Mich. 230, 110 N. W. 951,
10 L. R. A., N. S., 74, 11 Ann. Cas. 150; Mississippi: *East-
man Gardiner Co.* v. *Permenter*, 111 Miss. 813, 72 So. 234;
Missouri: *Eads* v. *Y. W. C. A.*, 325 Mo. 577, 29 S. W. 2d 701;
*Hope* v. *Barnes Hospital*, 227 Mo. App. 1055, 55 S. W. 2d
319; Nevada: *Bruce* v. *Young Men's Christian Ass'n*, 51
Nev. 372, 277 P. 798; New Hampshire: *Hewett* v. *Woman's
Hospital Aid Ass'n*, 73 N. H. 556, 64 A. 190, 7 L. R. A.,
N. S., 496; New York: *Hamburger* v. *Cornell University*,
240 N. Y. 328, 148 N. E. 539, 42 A. L. R. 955; North Caro-
lina: *Green* v. *Biggs*, 167 N. C. 417, 83 S. E. 553; *Johnson*
v. *City Hospital Co.*, 196 N. C. 610, 146 S. E. 573; Oregon:
*Hill* v. *President & Trustee of Tualatin Academy and Pac.
University*, 61 Or. 190, 121 P. 901; *O'Neill* v. *Odd Fellows
Home of Oregon*, 89 Or. 382, 174 P. 148; Pennsylvania:
*Fire Insurance Patrol* v. *Boyd*, 120 Pa. 624, 15 A. 553, 1
L. R. A. 417, 6 Am. St. Rep. 745; *Wildoner* v. *Central Poor
District of Luzerne County*, 267 Pa. 375, 110 A. 175; South
Carolina: *Vermillion* v. *Women's College of Due West*, 104
S. C. 197, 88 S. E. 649; Tennessee: *Abston* v. *Waldon Acad-
emy*, 118 Tenn. 24, 102 S. E. 351, 11 L. R. A., N. S., 1179;
*Lincoln Memorial University* v. *Sutton*, 163 Tenn. 298, 43
S. W. 2d 195; Washington: *Wells* v. *Ferry-Baker Lumber
Co.*, 57 Wash. 658, 107 P. 869, 29 L. R. A., N. S., 426;
*Thurston County Chapter, American Red Cross* v. *Depart-*

*ment of Labor & Industries of Washington,* 166 Wash. 488, 7 P. 2d 577; Wisconsin: *Bachman* v. *Y. W. C. A.,* 179 Wis. 178, 191 N. W. 751, 30 A. L. R. 448; Federal: *Higgons* v. *Pratt Institute,* 2 Cir., 45 F. 2d 698; *Boden Heimer* v. *Confederate Memorial Ass'n,* 4 Cir., 68 F. 2d 507, affirming D. C., 5 F. Supp. 526, certiorari denied, 292 U. S. 629, 54 S. Ct. 643, 78 L. Ed. 1483; *Candal De Lopez* v. *Auxilio Mutua y Beneficencia,* 1 Cir., 45 F. 2d 331. See 13 R. C. L. 945.

This court has never before had occasion to squarely lay down the rule that a charitable hospital is not liable to a patient, who has paid or has contracted to pay for his services, for injuries sustained by reason of the negligence of its nurses, but it has strongly intimated that such is the law. I cannot read either the Gitzhoffen Case or the former decision of this court in this case without feeling that the justices, concurring in those opinions, believed the law to be that such a hospital was immune from liability.

In the Gitzhoffen Case, supra, the holding was that a hospital institution of a strictly private character, conducted for gain and profit, and performing no charity, was liable to patients for negligence of its servants. But it was correctly pointed out in that decision that "hospitals organized for charitable purposes are not liable to their patients for injuries from the negligence of their employees, when reasonable care is used in the selection and retention of an employee." This quotation is from the former decision in the Sessions Case as a holding in the Gitzhoffen Case; and it is an accurate statement of what the court there said was the view supported by the great weight of authority. On the first appeal in this case the court held the demurrer to the complaint should have been overruled, but the case was not disposed of so simply. By its discussion of the character of the institution, the court clearly left the impression that if the trial court should find this hospital to be charitable in character, the rule of immunity would follow, notwithstanding plaintiff's intestate was a paying patient. Had the court

held to the view now announced, the case could and ought to have been disposed of without reference to the character of the institution because it was alleged and admitted that the patient here involved was a paying patient. In addition to what we have already quoted, the court further said:

"Once it is established, the institution, society, association, or corporation is charitable, and so, pursuing its purpose, the law of immunity seems to be settled."

To the extent indicated, this court has committed itself to the rule of immunity. Such then would seem to be the law of the case, binding on the trial court and, also, for the purposes of this case, on this court as well. *Washington Bridge Co.* v. *Stewart*, 3 How. 413, 11 L. Ed. 658; *United Dredging Co.* v. *Industrial Accident Comm.*, 208 Cal. 705, 284 P. 922; *Western Union Telegraph Co.* v. *Furlow*, 129 Ark. 116, 195 S. W. 368; *Campbell* v. *Lynch*, 88 W. Va. 209, 106 S. E. 869; *City of Atlanta* v. *Smith*, 165 Ga. 146, 140 S. E. 369, and cases therein cited. In the latter case the court, 165 Ga. 146, 140 S. E. 369, on page 371, said:

"The principle in the decision may be reviewed and overruled in another case between different parties, but as between the parties the decision stands as the law of the case. *Southern Bell Telephone, etc., Co.,* v. *Glawson*, supra, [140 Ga. 507], at page 509, 79 S. E. 136 and citations."

It has been held further that a ruling, which becomes the law of the case, is binding on the court upon subsequent appeal even though it subsequently appears to be erroneous. *Anthon State Bank* v. *Bernard*, 198 Iowa 1345, 201 N. W. 59; *Hubbard* v. *Jurian*, 47 Cal. App. 543, 190 P. 1052; *Dewey* v. *Gray*, 2 Cal. 374; *Burns* v. *Jackson*, 53 Cal. 345, 200 P. 80. In the cases of *Hubbard* v. *Jurian*, supra, and *Anthon State Bank* v. *Bernard*, supra, the courts were confronted with a more complex problem, in that between the time of the first appeal and the second appeal of the cases each court had laid down a contrary rule of law in other

cases. Nevertheless, the court stated that they were bound by their former rulings in the same cases. In *Anthon State Bank* v. *Bernard,* the court said at page 1350 of 198 Iowa, at page 61 of 201 N. W.:

"The doctrine there announced [on former appeal] has not been followed in our later decisions, where the renewal was with knowledge on the part of the maker of the fraud practiced upon him, *and has been expressly overruled. Farmers' & Merchants' Savings Bank* v. *Jones,* 196 Iowa 1071, 196 N. W. 57; *Grimes Savings Bank* v. *McHarg,* [197 Iowa 1393], 199 N. W. 365; *Sullivan* v. *Gaul,* [198 Iowa 630], 200 N. W. 12. *Nevertheless the rule announced by this court on the former appeal became the law of the case, and binding on the trial court and this court. Pfarr* v. *Standard Oil Co.,* 176 Iowa 577, 157 N. W. 132; *Kenyon* v. *Railroad Co.,* 187 Iowa 277, 173 N. W. 44; *Bolton* v. *Hey,* 168 Pa. 418, 31 A. 1097; *Heller* v. *Dailey,* 34 Ind. App. 424, 70 N. E. 821; *Cain* v. *Life Ins. Co.,* 123 Ky. 59, 93 S. W. 622, 124 Am. St. Rep. 313." (Italics added.)

From these cases one can readily see that in so far as the same case and the same parties are concerned, an appellate court, upon subsequent appeal, is bound by its prior decision or ruling, while if the parties are different or if it is a different case, the former decision might now be overruled. Concerning the weight that should be given to a former ruling in the same case, the Supreme Court of Colorado in the case of *Routt* v. *Greenwood Cemetery Land Co.,* 18 Colo. 132, 31 P. 858, 861, stated:

"The right of the petitioner to avail itself of the law of 1891, and make full payment, or tender the balance of the purchase price, is not open for discussion on this appeal On the former hearing that question was passed upon and settled, and is the law of this case. *Greenwood Cemetery Land Co.* v. *Routt,* supra [17 Colo. 156, 28 P. 1125, 15 L. R. A. 369, 31 Am. St. Rep. 284]. 'When the law governing a case has been once declared by the opinion of an appellate court on a direct appeal or writ of error, such opinion, on the retrial of the same case, upon the same state of facts, is higher authority than the rule of stare decisis; it is generally regarded as res judicata, so far as the particular action is concerned.' *Lee* v. *Stahl,* 13 Colo. 174, 22 P. 436, and cases there cited."

Other cases have held that the law of the case is "res judicata" so far as the appellate court is concerned upon a second appeal. *In re Cook's Estate,* 143 Iowa 733, 122 N. W. 578; *Austin-Western Road Machinery Co.* v. *Commercial State Bank,* Mo. App., 1926, 282 S. W. 105; *Jones* v. *Box Elder County, Utah,* 9 Cir., 67 F. 2d 900.

This doctrine of "the law of the case" has not been confined merely to the precise ruling or decision of the particular case involved, but has been extended to include matters which are involved in the decision and which are decided by implication. *Storthz* v. *Fullerton,* 185 Ark. 634, 48 S. W. 2d 560, 561. The court there said:

"It is well settled that on a second appeal the judgment on the former appeal becomes the law of the case, and is conclusive of every question of law or fact decided in the former suit, and also of those which might have been, but were not, presented. *Shackelford* v. *Arkansas Baptist College,* 183 Ark. 404, 36 S. W. 2d 78. And this is true whether we may now think the former decision was right or wrong. *St. Louis, I. M. & S. R. Co.* v. *York,* 92 Ark. 554, 123 S. W. 376; *Coca-Cola Bottling Co.* v. *Shipp,* 177 Ark. 757, 9 S. W. 2d 8."

In *State ex rel. Nicomen Boom Co.* v. *North Shore Boom & Driving Co.,* 62 Wash. 436, 113 P. 1104, 1105, it was held:

"The decision upon the other appeal was final and conclusive upon the appellants in this case as to all points which were, or could have been, raised therein. 'Questions determined on an appeal, or which might have been if presented, will not be considered by an appellate court upon a second appeal of the same action.' *State* v. *Boyce,* 25 Wash. 422, 65 P. 763; *State ex rel. Holgate* v. *Superior Court,* 19 Wash. 114, 52 P. 522; *Dennis* v. *Kass & Co.,* 13 Wash. 137, 42 P. 540; *Smith* v. *Seattle,* 20 Wash. 613, 56 P. 389."

The trial court on the second hearing, on demurrer to the amended complaint, interpreted and applied our previous ruling as I have indicated and after finding defendant to be a charitable institution concluded it was not liable for the negligence of its nurse.

So much for the authorities which, it seems, are overwhelming on the side of the immunity rule. I am not sure

that the reasons for the rule no longer exist. Indeed, it is my belief that strong reasons continue to call for the application of the rule. Every member of the public is interested in the building and maintaining of charitable institutions whose purpose is the care of the sick and injured and the alleviation of human suffering. The state itself is vitally interested in the health of its citizens and in the maintenance of hospitals where they might have hospitalization and medical care at the lowest possible cost. Indeed, hospitals, together with churches and schools, are the greatest community assets. The state has recognized this fact to the extent that such charitable institutions are immune from taxation.

The courts holding to the doctrine that a hospital, organized and conducted as a charitable institution, is not liable for injuries suffered by its patients due to the negligence of its employees, are not in accord as to the reasons for such immunity. The decisions are based on one or more of the following reasons: (1) Doctrine of implied waiver; (2) trust fund theory; (3) public policy. The implied waiver doctrine is that one who accepts the benefit of either a public or a private charity impliedly exempts the charitable institution from liability for the negligence of its servants in administering the charity. This theory, if valid, would apply whether the charity extended to all or only a part of such service. All patients who use the facilities of a charitable hospital are beneficiaries of the charity since the sums they pay are necessarily less in amount because of the beneficent acts of the donors in establishing a nonprofit institution wherein such patients may be served. This theory is well stated in *Powers* v. *Massachusetts Homeopathic Hospital*, 1 Cir., 109 F. 294, 303, 65 L. R. A. 372, as follows:

"That a man is sometimes deemed to assume a risk of negligence, so that he cannot sue for damages caused by the negligence, is familiar law. Such is the case of common employment, and such are the cases of athletic sports and the like, put by Pollock on page 150,

et seq. Such is the case at bar. One who accepts the benefit either of a public or of a private charity enters into a relation which exempts his benefactor from liability for the negligence of his servants in administering the charity; at any rate, if the benefactor has used due care in selecting those servants. To paraphrase the illustration put by the learned judge before whom this case was tried, it would be intolerable that a good Samaritan, who takes to his home a wounded stranger for surgical care, should be held personally liable for the negligence of his servant in caring for that stranger. * * * The purity of their aims may not justify their torts; but, if a suffering man avails himself of their charity, he takes the risk of malpractice, if their charitable agents have been carefully selected."

The trust fund theory holds that a trust fund cannot be used to compensate injured patients on account of negligence of the servants of a charitable hospital. Otherwise, the trust fund would be diverted from the purpose intended and thereby be depleted. Donors would be discouraged from making donations to hospitals if the funds donated might be diminished in value or the purpose thwarted by lawsuits and judgments and thus used for purposes wholly unintended by the donors. The intent of the donors is that the funds be placed in trust and used exclusively for the healing of the sick. This theory is well expressed in *Parks* v. *Northwestern University*, 218 Ill. 381, 75 N. E. 991, 993, 2 L. R. A., N. S., 556, 4 Ann. Cas. 103:

"The funds and property thus acquired are held in trust, and cannot be diverted to the purpose of paying damages for injuries caused by the negligent or wrongful acts of its servants and employees to persons who are enjoying the benefit of the charity. An institution of this character, doing charitable work of great benefit to the public without profit, and depending upon gifts, donations, legacies, and bequests made by charitable persons for the successful accomplishment of its beneficial purposes, is not to be hampered in the acquisition of property and funds from those wishing to contribute and assist in the charitable work by any doubt that might arise in the minds of such intending donors as to whether the funds supplied by them will be applied to the purposes for which they intended to devote them, or diverted to the entirely different purpose of satisfying judgments recovered against the donee because of the negligent acts of those employed to carry the beneficent purpose into execution."

The public policy theory is based on the reason that, since institutions such as charitable hospitals derive no profit from the operation and are founded for the sole purpose of conserving health and life of those who need their aid, justice and sound policy dictate they should be exempt from the usual liability attached to those engaged in enterprises for profit. It is possible that the public policy theory is broad enough to include and be bottomed by the other theories. That is, because of all the reasons assigned in the different theories, it is sound public policy to exempt the charitable institutions from the type of liability mentioned. A good exposition of the rule of immunity on the ground of public policy is stated in *Southern Methodist Hospital and Sanatorium of Tucson* v. *Wilson,* supra, quoting from *Hearns* v. *Waterbury Hospital,* 66 Conn. 98, 33 A. 595, 603, 31 L. R. A. 224. These cases argue that the doctrine of respondeat superior grew up in the early history of English law as a matter of public policy, that principles of abstract justice and common sense required that, where a master permitted his servant to perform certain acts by which another was injured, the master should be held responsible for those acts. The words respondeat superior mean "let the principal answer"; that is, the principal is responsible for the acts of his agent. In a recent case, *Gleason* v. *Salt Lake City,* 94 Utah 1, 74 P. 2d 1225, this court had occasion to discuss the doctrine of respondeat superior in relation to a different problem; and it was there shown that underlying the doctrine are the two principles that the principal has or is entitled to exercise control over the acts of his employee or agent, and he expects to derive an advantage by reason of the act which is being done for him. In the case of *Hearns* v. *Waterbury Hospital,* supra, as quoted in the Southern Methodist Hospital Case, the following reasons are given:

"The law which makes one responsible for an act not his own, because the actual wrongdoer is his servant, is based on a rule of public policy. The liability of a charitable corporation for the defaults

of its servants must depend upon the reasons of that rule of policy, and their application to such a corporation. The rule is distinguished as the doctrine of respondeat superior, although the phrase is used broadly in reference to any relation of principal and agent, thereby causing much confusion. Here we used it in the narrow meaning suggested by its origin. * * * It recognized an injustice, and declared a rule of public policy, i. e., an injury done by one who is irresponsible must be answered for by his superior, when for his own convenience and emolument that superior has given the wrongdoer the opportunity of committing the injury. This rule of public policy modified the development of the law of master and servant from the beginning, and in this way infused into the law of agency a sort of fictitious agency, depending, not on the principle of justice that makes one responsible for his own act, but on a rule of public policy which, under certain circumstances, estops one from showing that the act in question was not his own. This view is suggested by the opinion of Best, C. J., in *Hall* v. *Smith*, supra, [2 Bing. 156], and is the occasion of his emphatic declaration that respondeat superior is bottomed on the principle that he who expects to derive the advantage from an act done for him by another must answer for any injury which a third person sustains from it. The reasons for the rule have been differently stated by others. In *Maxmilian* v. *Mayor, etc.*, supra [62 N. Y. 160, 20 Am. Rep. 468], supra, the rule is based upon the right which the employer has to select his servants, to discharge them if not competent, and to control them while in his employ. In Dicey, Parties, rule 102, p. 446, the liability is stated as 'analogous to the liability of an owner for injuries committed by animals belonging to him. Neither the master nor owner is liable because he has himself done the particular act complained of. He is responsible because the wrong is the result of his having in the one case employed the incompetent servant, and in the other kept an animal of habits injurious to his neighbors.' Here the policy stated seems to be that the master should not only be liable for his negligence in the employment of servants, but should be held as a guarantor that none employed by him should abuse their opportunities. And a similar notion is expressed in Wood, Mast. & S., § 277, i. e., that the penalty of liability is imposed in order to secure in the master 'the exercise of proper care and diligence in the selection and retention of his agents.' Whart. Neg., § 157, gives, as the reason of the policy, that 'he who puts in operation an agency which he controls, while he receives its emoluments, is responsible for the injuries it incidentally inflicts,' relying on Lord Brougham's statement in *Duncan* v. *Findlater* [6 Clark & F. 894], 'I am liable for what is done for me and under my orders by the man I employ, for I may turn him from that employ when I please; and the reason that I am

liable is this, that by employing him I set the whole thing in motion, and what he does, being done for my benefit and under my direction, I am responsible for the consequences of doing it.'

"This defendant does not come within the main reason for the rule of public policy which supports the doctrine of respondeat superior. It derives no benefit from what its servant does, in the sense of that personal and private gain which was the real reason for the rule. Again, so far as the persons injured are concerned, especially if they be patients at the hospital, the defendant does not 'set the whole thing in motion,' in the sense in which that phrase is used as expressing a reason for the rule. Such patient, who may be injured by the wrongful act of a hospital servant, is not a mere third party, a stranger to the transaction. He is rather a participant. The thing about which the servants are employed is the healing of the sick. This is set in motion, not for the benefit of the defendant, but of the public. Surely, those who accept the benefit contributing also by their payments to the public enterprise, and not to the private pocket of the defendant, assist as truly as the defendant in setting the whole thing in motion. But the practical ground on which the rule is based is simply this: On the whole, substantial justice is best served by making a master responsible for the injuries caused by his servant acting in his service, when set to work by him to prosecute his private ends, with the expectation of deriving from that work private benefit. This has at times proved a hard rule, but it rests upon a public policy too firmly settled to be questioned. We are now asked to apply this rule, for the first time, to a class of masters distinct from all others, and who do not and cannot come within the reason of the rule. In other words, we are asked to extend the rule, and to declare a new public policy, and say: On the whole, substantial justice is best served by making the owners of a public charity, involving no private profit, responsible, not only for their own wrongful negligence, but also for the wrongful negligence of the servants they employ only for a public use and a public benefit. We think the law does not justify such an extension of the rule of respondeat superior. * * * The rule of respondeat superior, as is well shown, was originally founded solely on reasons of public policy. Such being the case, we think there are circumstances under which the application of that rule should, for the reasons of public policy also, be limited, and we are of the opinion that while it may do an injustice in individual cases, yet upon the whole it is for the best interests of the public to encourage the establishment and maintenance of charitable institutions by advising the donors thereto that their funds will not be diverted from their original purpose of charity to pay for the negligence of the employees of such

an institution, provided always that the management thereof uses reasonable care in the selection of its employees."

Although one's sensibilities may be shocked at the rule which exempts from liability any hospital where the patient actually receives an injury by reason of negligence of a nurse, we should keep in mind that a charitable hospital is not operated for profit, but solely for community benefit; that it is better for a few individuals to suffer than that the whole community should be deprived of a much needed charitable institution. It must also be remembered that in treating the sick and injured much must be left to nature to accomplish favorable results. Often, in spite of everything that can be done, patients leave the hospital dissatisfied with services or treatment. If the door of liability is once opened, there will be a fruitful field for exploitation by the dissatisfied and unscrupulous. The charitable hospital whose primary purpose is to care for the sick and injured would find itself concerned with the defending of lawsuits. Although the organization might win most of such suits, its funds and time of its manager and employees might be diverted from the true purpose of its organization to such a degree that the work of the institution would be seriously affected. The suggestion is made that liability insurance might be procured, but liability insurance costs money. Undoubtedly, rates for hospitalization would have to be raised as a result.

The large majority of the patrons of hospitals are persons in the so-called middle class who are neither rich nor poor, but whose financial condition is usually greatly affected by loss of income through sickness, and the cost of hospitalization and medical attention. The rich and well to do can always afford hospitalization and pay the medical charges. The very poor can usually find charitable hospitals where they will be cared for without charge, or organizations which will supply such hospitalization. It is a wise public policy which protects the public by encouraging

charitable hospitals to give to the public their services and use of their facilities at the least possible cost.

The parable of the Good Samaritan has been mentioned as if the only "Good Samaritan" were those who paid all the costs for a poor person's hospitalization and treatment. Would the Samaritan have been any less "good" or his act any less "charitable" had the man who was robbed and beaten had some money overlooked by the robbers with which he paid for his care to the extent of his funds, and the Samaritan had said to the innkeeper, "Take good care of this man, keep him until he is well and after he has paid what he can, I will pay the balance"? Should the "Samaritan" under those circumstances be held liable in damages for negligence of an agent or servant executing his wishes?

HANSON, Justice.

I concur in the views expressed by Mr. Chief Justice FOLLAND in his dissenting opinion.